JENKINS *v.* ANDERSON, WARDEN

No. 78–6809.  Argued January 8, 1980—Decided June 10, 1980

232

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and White, Blackmun, and Rehnquist, JJ., joined; and in all but Part II of which Stewart, J., joined. Stewart, J., filed a statement concurring in part and concurring in the judgment, post, p. 241. Stevens, J., filed an opinion concurring in the judgment, in Part I of which Stewart, J., joined, post, p. 241. Marshall, J., filed a dissenting opinion, in which Brennan, J., joined, post, p. 245.

*Carl Ziemba,* by appointment of the Court, 444 U. S. 914, argued the cause and filed a brief for petitioner.

*Robert A. Derengoski,* Solicitor General of Michigan, argued the cause for respondent. With him on the brief were *Frank J. Kelley,* Attorney General, and *Thomas L. Casey,* Assistant Attorney General.

Mr. Justice Powell delivered the opinion of the Court.

The question in this case is whether the use of prearrest silence to impeach a defendant's credibility violates either the Fifth or the Fourteenth Amendment to the Constitution.

I

On August 13, 1974, the petitioner stabbed and killed Doyle Redding. The petitioner was not apprehended until he turned himself in to governmental authorities about two weeks later. At his state trial for first-degree murder, the petitioner contended that the killing was in self-defense.

The petitioner testified that his sister and her boyfriend were robbed by Redding and another man during the evening of August 12, 1974. The petitioner, who was nearby when the robbery occurred, followed the thieves a short distance and reported their whereabouts to the police. According to the petitioner's testimony, the next day he encountered Red-

ding, who accused him of informing the police of the robbery. The petitioner stated that Redding attacked him with a knife, that the two men struggled briefly, and that the petitioner broke away. On cross-examination, the petitioner admitted that during the struggle he had tried "[t]o push that knife in [Redding] as far as [I] could," App. 36, but maintained that he had acted solely in self-defense.

During the cross-examination, the prosecutor questioned the petitioner about his actions after the stabbing:

"Q. And I suppose you waited for the Police to tell them what happened?
"A. No, I didn't.
"Q. You didn't?
"A. No.
"Q. I see.
"And how long was it after this day that you were arrested, or that you were taken into custody?" *Id.,* at 33.

After some discussion of the date on which petitioner surrendered, the prosecutor continued:

"Q. When was the first time that you reported the things that you have told us in Court today to anybody?
"A. Two days after it happened.
"Q. And who did you report it to?
"A. To my probation officer.
"Q. Well, apart from him?
"A. No one.
"Q. Who?
"A. No one but my—
"Q. (Interposing) Did you ever go to a Police Officer or to anyone else?
"A. No, I didn't.
"Q. As a matter of fact, it was two weeks later, wasn't it?
"A. Yes." *Id.,* at 34.

In closing argument to the jury, the prosecutor again referred to the petitioner's prearrest silence. The prosecutor noted that petitioner had "waited two weeks, according to the testimony—at least two weeks before he did anything about surrendering himself or reporting [the stabbing] to anybody." *Id., at* 43. The prosecutor contended that the petitioner had committed murder in retaliation for the robbery the night before.

The petitioner was convicted of manslaughter and sentenced to 10 to 15 years' imprisonment in state prison. The Michigan Court of Appeals affirmed the conviction, and the Michigan Supreme Court denied leave to appeal. The petitioner then sought a writ of habeas corpus from the Federal District Court for the Eastern District of Michigan, contending that his constitutional rights were violated when the prosecutor questioned him concerning prearrest silence. A Federal Magistrate concluded that the petition for habeas corpus relief should be denied. The District Court adopted the Magistrate's recommendation. The United States Court of Appeals for the Sixth Circuit affirmed. 599 F. 2d 1055. This Court granted a writ of certiorari. 444 U. S. 824 (1979). We now affirm.[1]

---

[1] The petitioner did not raise his constitutional claims during his state-court trial. Thus, the respondent argues that the rule of *Wainwright* v. *Sykes*, 433 U. S. 72 (1977), bars consideration of the petitioner's habeas petition. But the respondent failed to raise the *Sykes* question in either the District Court or the Court of Appeals. Ordinarily, we will not consider a claim that was not presented to the courts below. See *Dorszynski* v. *United States*, 418 U. S. 424, 431, n. 7 (1974). Considerations of judicial efficiency demand that a *Sykes* claim be presented before a case reaches this Court. The applicability of the *Sykes* "cause"-and-"prejudice" test may turn on an interpretation of state law. See *Rummel* v. *Estelle*, 445 U. S. 263, 267, n. 7 (1980). This Court's resolution of such a state-law question would be aided significantly by the views of other federal courts that may possess greater familiarity with Michigan law. Furthermore, application of the "cause"-and-"prejudice" standard may

## II

At trial the prosecutor attempted to impeach the petitioner's credibility by suggesting that the petitioner would have spoken out if he had killed in self-defense. The petitioner contends that the prosecutor's actions violated the Fifth Amendment as applied to the States through the Fourteenth Amendment. The Fifth Amendment guarantees an accused the right to remain silent during his criminal trial, and prevents the prosecution from commenting on the silence of a defendant who asserts the right. *Griffin* v. *California,* 380 U. S. 609, 614 (1965). In this case, of course, the petitioner did not remain silent throughout the criminal proceedings. Instead, he voluntarily took the witness stand in his own defense.

This Court's decision in *Raffel* v. *United States,* 271 U. S. 494 (1926), recognized that the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his prior silence. The defendant in *Raffel* was tried twice. At the first trial, a Government agent testified that Raffel earlier had made an inculpatory statement. The defendant did not testify. After the first trial ended in deadlock the agent repeated his testimony at the second trial, and Raffel took the stand to deny making such a statement. Cross-examination revealed that Raffel had not testified at the first trial. *Id.,* at 495, n. The Court held that inquiry into prior silence was proper because "[t]he immunity from giving testimony is one which the defendant may waive by offering himself as a witness. . . . When he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined. . . ." *Id.,* at 496–497. Thus, the *Raffel* Court concluded that the defendant was "subject to cross-examina-

---

turn on factual findings that should be made by a district court. Accordingly, we do not consider the *Sykes* issue in this case.

tion impeaching his credibility just like any other witness." *Grunewald* v. *United States,* 353 U. S. 391, 420 (1957).[2]

It can be argued that a person facing arrest will not remain silent if his failure to speak later can be used to impeach him. But the Constitution does not forbid "every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights." *Chaffin* v. *Stynchcombe,* 412 U. S. 17, 30 (1973). See *Corbitt* v. *New Jersey,* 439 U. S. 212, 218, and n. 8 (1978). The " 'threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.' " *Chaffin* v. *Stynchcombe, supra,* at 32, quoting *Crampton* v. *Ohio,* decided with *McGautha* v. *California,* 402 U. S. 183, 213 (1971).[3] The *Raffel* Court ex-

---

[2] In *Raffel,* the defendant's decision not to testify at his first trial was an invocation of his right to remain silent protected by the Fifth Amendment. In this case, the petitioner remained silent before arrest, but chose to testify at his trial. Our decision today does not consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment. We simply do not reach that issue because the rule of *Raffel* clearly permits impeachment even if the prearrest silence were held to be an invocation of the Fifth Amendment right to remain silent.

[3] In *Crampton* v. *Ohio,* the Court considered a claim that a murder defendant's right to remain silent was burdened unconstitutionally because he could not argue for mitigation of punishment without risking incrimination on the question of guilt. The Court recognized that a defendant who speaks in his own defense cannot avoid testifying fully.

"It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. See, *e. g., Brown* v. *Walker,* 161 U. S. 591, 597–598 (1896); *Fitzpatrick* v. *United States,* 178 U. S. 304, 314–316 (1900); *Brown* v. *United States,* 356 U. S. 148 (1958). It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. See *Spencer* v. *Texas,* 385 U. S. [554, 561 (1967)]; cf. *Michelson* v. *United States,* 335 U. S. 469 (1948); but cf. *Luck* v. *United States,* 121 U. S.

plicitly rejected the contention that the possibility of impeachment by prior silence is an impermissible burden upon the exercise of Fifth Amendment rights. "We are unable to see that the rule that [an accused who] testifies . . . must testify fully, adds in any substantial manner to the inescapable embarrassment which the accused must experience in determining whether he shall testify or not." 271 U. S., at 499.[4]

This Court similarly defined the scope of the Fifth Amendment protection in *Harris* v. *New York,* 401 U. S. 222 (1971). There the Court held that a statement taken in violation of *Miranda* v. *Arizona,* 384 U. S. 436 (1966), may be used to impeach a defendant's credibility. Rejecting the contention that such impeachment violates the Fifth Amendment, the Court said:

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege

App. D. C. 151, 348 F. 2d 763 (1965); *United States* v. *Palumbo,* 401 F. 2d 270 (CA2 1968)." 402 U. S., at 215.

The Court concluded that "the policies of the privilege against compelled self-incrimination are not offended when a defendant in a capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt." *Id.,* at 217. Subsequently, a petition for rehearing in *Crampton* was granted and the underlying state-court decision was vacated on Eighth Amendment grounds. 408 U. S. 941 (1972).

[4] Both MR. JUSTICE STEVENS, *post,* at 241–242, n. 2, and MR. JUSTICE MARSHALL, *post,* at 252, suggest that the constitutional rule of *Raffel* was limited by later decisions of the Court. In fact, no Court opinion decided since *Raffel* has challenged its holding that the Fifth Amendment is not violated when a defendant is impeached on the basis of his prior silence. In *United States* v. *Hale,* 422 U. S. 171, 175, n. 4 (1975), the Court expressly declined to consider the constitutional question. The decision in *Stewart* v. *United States,* 366 U. S. 1 (1961), was based on federal evidentiary grounds, not on the Fifth Amendment. The Court in *Grunewald* v. *United States,* 353 U. S. 391, 421 (1957), stated that it was not required to re-examine *Raffel.* In all three cases, the Court merely considered the question whether, as a matter of federal evidentiary law, prior silence was sufficiently inconsistent with present statements as to be admissible. See also n. 5, *infra.*

cannot be construed to include the right to commit perjury. . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." 401 U. S., at 225.

See also *Oregon* v. *Hass,* 420 U. S. 714, 721–723 (1975); *Walder* v. *United States,* 347 U. S. 62, 65 (1954).

In determining whether a constitutional right has been burdened impermissibly, it also is appropriate to consider the legitimacy of the challenged governmental practice. See *Chaffin* v. *Stynchcombe, supra,* at 32, and n. 20. Attempted impeachment on cross-examination of a defendant, the practice at issue here, may enhance the reliability of the criminal process. Use of such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts. A defendant may decide not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. Once a defendant decides to testify, "[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Brown* v. *United States,* 356 U. S. 148, 156 (1958).

Thus, impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial. We conclude that the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility.

### III

The petitioner also contends that use of prearrest silence to impeach his credibility denied him the fundamental fairness guaranteed by the Fourteenth Amendment. We do not

agree. Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A J. Wigmore, Evidence § 1042, p. 1056 (Chadbourn rev. 1970). Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative. For example, this Court has exercised its supervisory powers over federal courts to hold that prior silence cannot be used for impeachment where silence is not probative of a defendant's credibility and where prejudice to the defendant might result. See *United States* v. *Hale,* 422 U. S. 171, 180–181 (1975); *Stewart* v. *United States,* 366 U. S. 1, 5 (1961); *Grunewald* v. *United States,* 353 U. S., at 424.[5]

Only in *Doyle* v. *Ohio,* 426 U. S. 610 (1976), did we find that impeachment by silence violated the Constitution. In that case, a defendant received the warnings required by *Miranda* v. *Arizona, supra,* at 467–473, when he was arrested for selling marihuana. At that time, he made no statements to the police. During his subsequent trial, the defendant testified that he had been framed. The prosecutor impeached the defendant's credibility on cross-examination by revealing that the defendant remained silent after his arrest. The State argued that the prosecutor's actions were permissible, but we concluded that "the *Miranda* decision compels rejection of the State's position." 426 U. S., at 617. *Miranda*

---

[5] Mr. Justice Marshall contends that the petitioner's prearrest silence is not probative of his credibility. *Post,* at 248–250. In this case, that is a question of state evidentiary law. In a federal criminal proceeding the relevance of such silence, of course, would be a matter of federal law. See *United States* v. *Hale, supra,* at 181. Mr. Justice Marshall's further conclusion that introduction of the evidence in this trial violated due process relies upon the Court's reasoning in *Doyle* v. *Ohio,* 426 U. S. 610 (1976), and *United States* v. *Hale. Post,* at 246–250. But the Court's decision in *Hale* rested upon nonconstitutional grounds, see n. 4, *supra,* and *Doyle* is otherwise distinguishable, see *infra,* at 240.

warnings inform a person that he has the right to remain silent and assure him, at least implicitly, that his subsequent decision to remain silent cannot be used against him. Accordingly, " 'it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.' " *Id.*, at 619, quoting *United States* v. *Hale, supra*, at 182–183 (WHITE, J., concurring in judgment).[6]

In this case, no governmental action induced petitioner to remain silent before arrest. The failure to speak occurred before the petitioner was taken into custody and given *Miranda* warnings. Consequently, the fundamental unfairness present in *Doyle* is not present in this case. We hold that impeachment by use of prearrest silence does not violate the Fourteenth Amendment.

## IV

Our decision today does not force any state court to allow impeachment through the use of prearrest silence. Each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial. We merely conclude that the use of prearrest silence to impeach a defendant's credibility does not

---

[6] The Court reached a similar result in *Johnson* v. *United States*, 318 U. S. 189 (1943). A trial judge mistakenly told a defendant that he could claim the privilege against self-incrimination. After the defendant invoked the privilege, the prosecutor commented on the defendant's refusal to speak. Under its supervisory power, this Court held that the prosecutor's comments constituted error because the trial court had assured the defendant that he might claim the protections of the Fifth Amendment. The Court stated that "[e]lementary fairness requires that an accused should not be misled on that score." *Id.*, at 197; see *Doyle* v. *Ohio, supra*, at 618, n. 9. See also *Raley* v. *Ohio*, 360 U. S. 423, 437–438 (1959).

violate the Constitution. The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEWART concurs in the judgment, agreeing with all but Part II of the opinion of the Court, and with Part I of the opinion of MR. JUSTICE STEVENS concurring in the judgment.

MR. JUSTICE STEVENS, concurring in the judgment.

My approach to both of petitioner's constitutional claims differs from the Court's. I would reject his Fifth Amendment claim because the privilege against compulsory self-incrimination [1] is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak. I would reject his due process claim for the reasons stated in my dissenting opinion in *Doyle* v. *Ohio*, 426 U. S. 610, 620.

## I

The Court holds that a defendant who elects to testify in his own behalf waives any Fifth Amendment objection to the use of his prior silence for the purpose of impeachment. As the Court correctly points out, this holding is squarely supported by *Raffel* v. *United States*, 271 U. S. 494, in which the Court upheld the use of a defendant's failure to take the stand at his first trial to impeach his testimony on retrial. Nevertheless, I would not rely on *Raffel* because such reliance incorrectly implies that a defendant's decision not to testify at his own trial is constitutionally indistinguishable from his silence in a precustody context.[2] But the two situations are fundamentally different.

---

[1] The Fifth Amendment provides in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ."

[2] Moreover, there is a serious question about the continuing vitality of *Raffel*. In *Johnson* v. *United States*, 318 U. S. 189, 199, the Court stated that when a trial judge "grants the claim of privilege but allows

In the trial context it is appropriate to presume that a defendant's silence is an exercise of his constitutional privilege and to prohibit any official comment that might deter him from exercising that privilege.[3] For the central purpose of the Fifth Amendment privilege is to protect the defendant from being compelled to testify against himself at his own trial.[4] Moreover, since a defendant's decision whether to tes-

it to be used against the accused to his prejudice, we cannot disregard the matter. That procedure has such potentialities of oppressive use that we will not sanction its use in the federal courts over which we have supervisory powers."

In *Grunewald* v. *United States*, 353 U. S. 391, 415–424, the Court held that it was error to permit the prosecutor, when cross-examining the defendant at trial, to use his assertion of the Fifth Amendment privilege while a witness before the grand jury for impeachment. In effect, the Court limited *Raffel* to cases in which the probative value of the cross-examination outweighed its possible impermissible effect on the jury; see 353 U. S., at 420–421. Because the Court held the probative value of the assertion of privilege to be negligible on the issue of the defendant's credibility, it was "not faced with the necessity of deciding whether *Raffel* has been stripped of vitality by the later *Johnson* case, *supra*, or of otherwise re-examining *Raffel.*" *Id.*, at 421. Mr. Justice Black, writing for four Justices, would have expressly overruled *Raffel*. He could "think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them." 353 U. S., at 425.

See also *Stewart* v. *United States*, 366 U. S. 1, 5–7; *United States* v. *Hale*, 422 U. S. 171, 175, n. 4.

[3] "For comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 55, which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." *Griffin* v. *California*, 380 U. S. 609, 614 (footnote omitted).

[4] "The Fifth Amendment protects the individual's right to remain silent. The central purpose of the privilege against compulsory self-incrimination is to avoid unfair criminal trials. It is an expression of our conviction that the defendant in a criminal case must be presumed innocent, and that the State has the burden of proving guilt without resorting to an

tify is typically based on the advice of his counsel, it often could not be explained without revealing privileged communications between attorney and client.

These reasons have no application in a prearrest context. The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police. We need not hold that every citizen has a duty to report every infraction of law that he witnesses in order to justify the drawing of a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out.[5] When a citizen is under no official compulsion what-

---

inquisition of the accused." *Lefkowitz* v. *Cunningham,* 431 U. S. 801, 810 (STEVENS, J., dissenting) (footnote omitted).

"The Fifth Amendment itself is predicated on the assumption that there are innocent persons who might be found guilty if they could be compelled to testify at their own trials. Every trial lawyer knows that some truthful denials of guilt may be considered incredible by a jury—either because of their inherent improbability or because their explanation, under cross-examination, will reveal unfavorable facts about the witness or his associates. The Constitution therefore gives the defendant and his lawyer the absolute right to decide that the accused shall not become a witness against himself." *Lakeside* v. *Oregon,* 435 U. S. 333, 343 (STEVENS, J., dissenting) (footnote omitted).

[5] There is, of course, no reason why we should encourage the citizen to conceal criminal activity of which he has knowledge. In *Roberts* v. *United States,* 445 U. S. 552, 557–558, we pointed out:

"Concealment of crime has been condemned throughout our history. The citizen's duty to 'raise the "hue and cry" and report felonies to the authorities,' *Branzburg* v. *Hayes,* 408 U. S. 665, 696 (1972), was an established tenet of Anglo-Saxon law at least as early as the 13th century. 2 W. Holdsworth, History of English Law 101–102 (3d ed. 1927); 4 *id.,* at 521–522; see Statute of Westminster First, 3 Edw. 1, ch. 9, p. 43 (1275); Statute of Westminster Second, 13 Edw. 1, chs. 1, 4, and 6, pp. 112–115 (1285). The first Congress of the United States enacted a statute imposing criminal penalties upon anyone who, 'having knowledge of the actual commission of [certain felonies,] shall conceal, and not as soon as may be disclose and make known the same to [the appropriate] authority. . . .' Act of Apr. 30, 1790, § 6, 1 Stat. 113. Although the term 'misprision

ever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment.[6] For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent. A different view ignores the clear words of the Fifth Amendment. See n. 1, *supra*. Consequently, I would simply hold that the admissibility of petitioner's failure to come forward with the excuse of self-defense shortly after the stabbing raised a routine evidentiary question that turns on the probative significance of that evidence and presented no issue under the Federal Constitution.[7]

## II

For the reasons stated in Part I of my dissenting opinion in *Doyle* v. *Ohio,* 426 U. S., at 620–626, I do not agree with the Court's view that the warnings required by *Miranda* v. *Arizona,* 384 U. S. 436, 479, contain an implicit assurance that subsequent silence may not be used against the defendant.

---

of felony' now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.

"This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself. Unless his silence is protected by the privilege against self-incrimination, . . . the criminal defendant no less than any other citizen is obliged to assist the authorities." (Footnote omitted.)

[6] "Petitioner insists that he had a constitutional right to remain silent and that no adverse inferences can be drawn from the exercise of that right. We find this argument singularly unpersuasive. The Fifth Amendment privilege against compelled self-incrimination is not self-executing. At least where the Government has no substantial reason to believe that the requested disclosures are likely to be incriminating, the privilege may not be relied upon unless it is invoked in a timely fashion." *Roberts* v. *United States, supra,* at 559.

[7] Under my approach, assuming relevance, the evidence could have been used not only for impeachment but also in rebuttal even had petitioner not taken the stand.

See *ante,* at 239–240. As the Court actually acknowledged in *Doyle* itself, see 426 U. S., at 619–620, n. 11, any such implicit assurance is far from being unqualified.[8] Moreover, I continue to disagree with the Court's view, repeated today, *ante,* at 240, that there was "fundamental unfairness present in *Doyle.*" In my judgment the fairness or unfairness of using a defendant's postarrest silence for impeachment purposes does not simply depend on whether or not he received *Miranda* warnings. Rather, it primarily depends on whether it is fair to infer that the defendant was silent because he was asserting his constitutional privilege.[9]

In any event, since I was unpersuaded by the due process rationale of *Doyle,*[10] I readily concur in the Court's rejection of a similar argument in this case.

MR. JUSTICE STEWART concurs in Part I of this opinion.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

Today the Court holds that a criminal defendant's testimony in his own behalf may be impeached by the fact that

---

[8] It is interesting to note that MR. JUSTICE MARSHALL and MR. JUSTICE BRENNAN share my view that the *Miranda* warnings in *Doyle* did not create the right to remain silent or create an otherwise unavailable objection to the use of the defendants' silence for impeachment purposes. See *post,* at 247–248, n. 1. I do not, however, agree with their assumption that a holding that evidence of silence is admissible necessarily rests on the premise that a quiet person has any duty to speak. See *post,* at 250–251, n. 4. A dog's failure to bark may be probative whether or not he has been trained as a watchdog. Cf. A. Conan Doyle, Silver Blaze, in The Complete Sherlock Holmes (1938).

[9] Generally, in the absence of an express assertion of the privilege, the presumption is that the privilege was not exercised. See *Roberts* v. *United States, supra,* at 559–560.

[10] It strikes me as anomalous that, assuming *Raffel* v. *United States,* 271 U. S. 494, has survived *Doyle,* a defendant who takes the stand is deemed to waive his Fifth Amendment objection to the use of his pretrial silence,

he did not go to the authorities before his arrest and confess his part in the offense. The decision thus strikes a blow at two of the foundation stones of our constitutional system: the privilege against self-incrimination and the right to present a defense.

## I

The Court's decision today is extraordinarily broad. It goes far beyond a simple holding that the common-law rule permitting introduction of evidence of silence in the face of accusation or in circumstances calling for a response does not violate the privilege against self-incrimination. For in this case the prosecution was allowed to cast doubt on an accused's testimony that he acted in self-defense by forcing him to testify that he did not go to the police of his own volition, before he had been indicted, charged, or even accused of any offense, and volunteer his version of the events.

The Court's holding that a criminal defendant's testimony may be impeached by his prearrest silence has three patent—and, in my view, fatal—defects. First, the mere fact of prearrest silence is so unlikely to be probative of the falsity of the defendant's trial testimony that its use for impeachment purposes is contrary to the Due Process Clause of the Fourteenth Amendment. Second, the drawing of an adverse inference from the failure to volunteer incriminating statements impermissibly infringes the privilege against self-incrimination. Third, the availability of the inference for impeachment purposes impermissibly burdens the decision to exercise the constitutional right to testify in one's own defense.

## A

The use of prior silence for impeachment purposes depends, as the majority recognizes, *ante,* at 238, on the reasonableness

but not to waive what I regard as a much less focussed, and hence weaker, due process objection. Perhaps the Court's opinion can best be understood by assuming that *Raffel* is not good law on its facts under the *Doyle* rationale.

of an inference that it is inconsistent with the statements that are to be impeached. If the defendant's prior silence does not make it more likely that his trial testimony was false, the evidence is simply irrelevant. Such an inference cannot fairly be drawn from petitioner's failure to go to the police before any charges were brought, admit that he had committed a homicide, and offer an exculpatory explanation.

In order for petitioner to offer his explanation of self-defense, he would necessarily have had to admit that it was he who fatally stabbed the victim, thereby supplying against himself the strongest possible proof of an essential element of criminal homicide. It is hard to imagine a purer case of self-incrimination. Since we cannot assume that in the absence of official warnings individuals are ignorant of or oblivious to their constitutional rights, we must recognize that petitioner may have acted in reliance on the constitutional guarantee. In fact, petitioner had most likely been informed previously of his privilege against self-incrimination, since he had two prior felony convictions. App. 28. One who has at least twice before been given the *Miranda* warnings, which carry the implied promise that silence will not be penalized by use for impeachment purposes, *Doyle* v. *Ohio*, 426 U. S. 610 (1976), may well remember the rights of which he has been informed, and believe that the promise is still in force. Accordingly, the inference that petitioner's conduct was inconsistent with his exculpatory trial testimony is precluded. See *Doyle* v. *Ohio, supra; United States* v. *Hale*, 422 U. S. 171, 176–177 (1975).[1]

---

[1] See also E. Cleary, McCormick on Evidence § 161, pp. 355–356 (2d ed. 1972). For this reason I would not reach a different result from that of *Doyle* v. *Ohio* simply because in *Doyle* the defendant had received the *Miranda* warnings. The furnishing of the *Miranda* warnings does not create the right to remain silent; that right is conferred by the Constitution. I have no doubt that if an accused were interrogated in police custody without receiving the *Miranda* warnings and remained silent, that silence would be inadmissible despite the lack of warnings. In that situa-

Moreover, other possible explanations for silence spring readily to mind. It is conceivable that a person who had acted in self-defense might believe that he had committed no crime and therefore had no call to explain himself to the police. Indeed, all the witnesses agreed that after the stabbing the victim ran across the street and climbed a flight of stairs before collapsing. Initially, at least, then, petitioner might not have known that there was a homicide to explain. Moreover, petitioner testified that he feared retaliation if he went to the police. One need not be persuaded that any of these possible explanations represents the true reason for petitioner's conduct to recognize that the availability of other plausible hypotheses vitiates the inference on which the admissibility of the evidence depends. See *United States* v. *Hale, supra,* at 176–177, 180.

The Court implies that its decision is consistent with the practice at common law; but at common law silence is admissible to contradict subsequent statements only if the circumstances would naturally have called for a response. For example, silence was traditionally considered a tacit admission

---

tion, no less than under the facts of *Doyle,* silence is "insolubly ambiguous." 426 U. S., at 617. Thus, properly considered, the use in *Doyle* of post-arrest silence for impeachment purposes was fundamentally unfair not because it broke an implied promise by a single narcotics agent, but because it broke a promise made by the United States Constitution. Similarly, persons who are not taken into police custody may rely on their privilege not to incriminate themselves in failing to report their conduct to the police. Such silence is also "insolubly ambiguous."

I do not regard the facts of *Doyle* and this case as analytically indistinguishable, however, for in *Doyle* the possibility that the defendant may have known his constitutional rights became a certainty when he was informed of those rights by the police. I simply believe that in both cases, the existence of the privilege against self-incrimination renders the probative value of the accused's silence so negligible that, in view of its plainly prejudicial effect, the use of that silence for impeachment purposes violates the defendant's federal right to due process. That is why I disagree with the Court's statement that the lack of probativeness of the evidence was merely "a question of state evidentiary law." *Ante,* at 239, n. 5.

if a statement made in the party's presence was heard and understood by the party, who was at liberty to respond, in circumstances naturally calling for a response, and the party failed to respond.[2] Silence was not considered an admission if any of the prerequisites were absent, for in such a case the failure to speak could be explained other than as assent. Similarly, failure to assert a fact could be used for impeachment if it would have been natural, under the circumstances, to assert the fact. But the authority cited by the majority in support of this proposition, *ante,* at 239, makes it clear that the rule cannot be invoked unless the facts affirmatively show that the witness was called on to speak, circumstances which are not present in this case.[3] As we have previously observed, "[i]n most circumstances silence is so ambiguous that it is of little probative force." *United States* v. *Hale, supra,* at 176.

Since petitioner's failure to report and explain his actions prior to his arrest was not probative of the falsity of his testimony at trial, it was fundamentally unfair and a deprivation

---

[2] See, *e. g.,* McCormick, *supra* n. 1, §§ 161, 270; 4 J. Wigmore, Evidence §§ 1071, 1072 (J. Chadbourn rev. 1970); Gamble, The Tacit Admission Rule: Unreliable and Unconstitutional—A Doctrine Ripe for Abandonment, 14 Ga. L. Rev. 27 (1979); Brody, Admissions Implied from Silence, Evasion and Equivocation in Massachusetts Criminal Cases, 42 B. U. L. Rev. 46 (1962); Heller, Admissions by Acquiescence, 15 U. Miami L. Rev. 161 (1960); Note, Tacit Criminal Admissions, 112 U. Pa. L. Rev. 210 (1963).

[3] The Wigmore treatise lists three categories of cases in which silence may be used for impeachment:

"(1) Omissions *in legal proceedings* to assert what would naturally have been asserted under the circumstances.

"(2) Omissions to assert anything . . . *when formerly narrating,* on the stand or elsewhere, the matter now dealt with.

"(3) *Failure to take the stand* at all. . . ." 3A Wigmore, *supra,* § 1042, pp. 1056–1058 (footnotes omitted, emphasis in original).

Plainly, the omission to seek out an opportunity to speak is not included within these categories. Of all the cases cited by Wigmore involving silence by a criminal defendant, not one involves prearrest silence by a suspect not in the presence of law enforcement officers.

of due process to allow the jury to draw from that silence an inference that his trial testimony was false. *Doyle* v. *Ohio, supra.*

## B

The use of prearrest silence for impeachment purposes also violates the privilege against self-incrimination secured by the Fifth and Fourteenth Amendments. The privilege prohibits the government from imposing upon citizens any duty to present themselves to the authorities and report their own wrongdoing. See, *e. g., Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968); *Haynes* v. *United States,* 390 U. S. 85 (1968); *Albertson* v. *SACB,* 382 U. S. 70 (1965). As I have explained, in order to offer his exculpatory explanation petitioner would inevitably have had to incriminate himself as to facts that would be crucial in any subsequent prosecution. To penalize him for failing to relinquish his privilege against self-incrimination by permitting the jury to draw an adverse inference from his silence is to place an impermissible burden on his exercise of the privilege. See *Griffin* v. *California,* 380 U. S. 609 (1965). In practical effect, it replaces the privilege against self-incrimination with a duty to incriminate oneself. The Court attempts to avoid this conclusion by asserting that the burden does not threaten the purposes underlying the Fifth Amendment. See *ante,* at 236. But it is hard to see how the burden could be more substantial or direct.[4]

---

[4] I confess I find MR. JUSTICE STEVENS' view of the Fifth Amendment incomprehensible. Apparently, under that view, a person's right not to incriminate himself exists only if the government has already attempted to compel him to do so. See *ante,* at 243–244 (opinion concurring in judgment). If no officials have tried to get the person to speak, he evidently has a duty to incriminate himself, because the reporting of crime is a civic duty and the Fifth Amendment is not applicable since the decision to speak or remain silent is, at that time, "voluntary." See *ante,* at 244.

But the prohibition against compelled self-incrimination is another way of expressing the right not to incriminate oneself. See, *e. g., United States* v. *Burr,* 25 F. Cas. 38, 39 (No. 14,692e) (CC Va. 1807) ("It is a

It is sophistry to assert that the use of prearrest silence for impeachment does not infringe the privilege against self-incrimination because the fact of the silence will not come out unless petitioner chooses to testify, see *ante,* at 238. An accused has the absolute right to testify in his own defense, as well as the absolute right to refuse to incriminate himself prior to trial. He may not be forced to choose between those fundamental guarantees. We may not ignore the commands of the Constitution by asserting that the defendant brought his difficulties on himself by exercising the precious right to present a defense. Nor should we piously proclaim the protection of individual liberties but extend that protection only to the prosecution's case in chief while ensuring that the evidence can come before the jury by the back door. See *Harris* v.

---

settled maxim of law that no man is bound to criminate himself"). After all, the only means of compelling a person to incriminate himself is to penalize him if he does not. Of course the voluntary decision to remain silent in the absence of any official compulsion does not "raise any issue under the Fifth Amendment," *ante,* at 244 (STEVENS, J., concurring in judgment), since there has been no self-incrimination at all. A voluntary decision to speak also does not implicate the Fifth Amendment because the self-incrimination was not compelled. But to impose a duty to report one's own crime before an official accusation has been made would itself be to compel self-incrimination, thus bringing the Fifth Amendment into play. And, as *Griffin* v. *California,* 380 U. S. 609 (1965), makes plain, the Constitution also prohibits the government from burdening the right not to incriminate oneself by penalizing silence. In the present case the violation of the Fifth Amendment occurred not when the defendant remained silent, but when that silence was later used against him at his criminal trial.

MR. JUSTICE STEVENS relies heavily on *Roberts* v. *United States,* 445 U. S. 552 (1980). That case held that a more severe sentence could be imposed on a defendant as a result of his refusal to provide information about criminal activities of *other* persons. The Court rejected Roberts' Fifth Amendment claim on grounds plainly inapplicable to this case: "At least where the Government has no substantial reason to believe that the requested disclosures are likely to be incriminating, the privilege may not be relied upon unless it is invoked in a timely fashion." *Id.,* at 559; but see *id.,* at 565–566 (MARSHALL, J., dissenting).

*New York,* 401 U. S. 222, 226–232 (1971) (BRENNAN, J., dissenting).

The Court's reasoning is not saved by its reliance on *Raffel* v. *United States,* 271 U. S. 494 (1926). *Raffel* held that a defendant could be required, upon testifying at a retrial, to disclose his failure to testify at the earlier trial. In my view, *Raffel* was wrongly decided; our subsequent cases, without expressly overruling it, limited it so severely as to appear to rob it of any continued vitality until its resurrection today. In *Grunewald* v. *United States,* 353 U. S. 391 (1957), the Court read *Raffel* as holding simply that a defendant who testifies at a second trial cannot continue to take advantage of the privilege asserted at the first trial. Instead, by taking the stand the defendant "becomes subject to cross-examination impeaching his credibility just like any other witness." 353 U. S., at 420. But *Grunewald* carefully pointed out that "[t]he Court, in *Raffel,* did not focus on the question whether the cross-examination there involved was in fact probative in impeaching the defendant's credibility." *Ibid.* The logical underpinnings of *Raffel* were cut away almost completely by *Griffin* v. *California,* 380 U. S. 609 (1965).[5] Thus the majority's statement that *Raffel* holds that "the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his prior silence," *ante,* at 235, is both simplistic and overbroad.

---

[5] Mr. Justice Black's concurring opinion for four Members of the Court in *Grunewald,* which he would have decided on constitutional grounds rather than under the Court's supervisory powers, eloquently foreshadowed the reasoning of *Griffin*:

"I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution." *Grunewald* v. *United States,* 353 U. S. 391, 425–426 (1957).

Further, the Court implies most unfairly that to exclude evidence of petitioner's prior silence would be to countenance perjury. See *ante,* at 237–238. The Court quotes from *Harris* v. *New York, supra,* but in that case the defendant made two contradictory statements at different times. It was logical to infer, absent an explanation to the contrary, that the defendant was lying on one occasion or the other. See also *Walder* v. *United States,* 347 U. S. 62 (1954). Here there is only one statement, and a silence which is not necessarily inconsistent with the statement. There is no basis on which to conjure up the specter of perjury.

## C

Finally, impeachment by prearrest silence impermissibly burdens the constitutionally protected decision to testify in one's own defense.

Under today's decision a defendant who did not report his conduct to the police at the first possible moment must, in deciding whether to testify in his own defense, take into account the possibility that if he does testify the jury may be permitted to add that omission to the reasons for disbelieving his defense. This means that a person who thinks he may have done something wrong must immediately decide, most likely without the assistance of counsel, whether, if he is ever charged with an offense and brought to trial, he may wish to take the stand. For if he may later want to take the stand, he had better go to the police station right away to preserve his exculpatory explanation of the events—even though in so doing he must incriminate himself and provide evidence which may be crucial to his eventual conviction. But if he decides not to incriminate himself, he may anticipate that his right to testify in his own defense will be undermined by the argument that his story is probably untrue because he did not volunteer it to the police at the earliest opportunity. All of these strategic decisions must be made before the individual even

knows if he will be charged and of what offense he will be accused.

To force persons to make this kind of choice between two fundamental rights places an intolerable burden on the exercise of those rights. "It cuts down on the privilege [of testifying in one's own defense] by making its assertion costly," *Griffin* v. *California, supra,* at 614, and is therefore forbidden.

## II

I have explained why I believe the use for impeachment purposes of a defendant's prearrest failure to volunteer his version of events to the authorities is constitutionally impermissible. I disagree not only with the Court's holding in this case, but as well with its emerging conception of the individual's duty to assist the State in obtaining convictions, including his own—a conception which, I believe, is fundamentally at odds with our constitutional system. See, *e. g.,* *Roberts* v. *United States,* 445 U. S. 552, 569–572 (1980) (MARSHALL, J., dissenting). This conception disparages not only individual freedoms, but also the social interest in preserving those liberties and in the integrity of the criminal justice system. There is no doubt an important social interest in enabling police and prosecutors to obtain convictions. But the Court does not serve the Nation well by subordinating to that interest the safeguards that the Constitution guarantees to the criminal defendant.