**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Allen HELGESON, Defendant and Appellant.**

**Cr. No. 754.**

Supreme Court of North Dakota.

March 12, 1981.

Tuntland Law Office, Garrison, for defendant and appellant; argued by Carl J. Martin, Garrison.

John Romanick, State's Atty., Washburn, for plaintiff and appellee.

PAULSON, Justice.

Allen Helgeson appeals from a judgment of conviction entered against him by the District Court of McLean County on October 13, 1980. A 12-member jury returned a verdict which found Helgeson guilty of committing the offense of negligent homi-

cide. We affirm the judgment of conviction.

Helgeson and Dennis James White Horse were employed at the All Seasons Arena on the State Fairgrounds in Minot. On May 2, 1980, at 5 p. m. Helgeson and White Horse drove east of Minot in order to pick up parts from an automotive repair shop. Having met with little success in obtaining the needed parts, Helgeson and White Horse entered several taverns in Minot and consumed beer and mixed drinks, after which they purchased additional beer and wine to take with them while they drove to Ruthville, where they met White Horse's cousin, Robert Roy. Near daybreak on May 3, 1980, the three men drove to Minot in order to purchase cigarettes. Because White Horse was unable to drive his car, a white Ford Fairmont station wagon, Helgeson drove the station wagon to Minot and then proceeded to drive to Garrison in order to visit his parents. White Horse gave no indication to Helgeson that he wanted to visit someone at Underwood or Garrison. Helgeson's parents had homes in Garrison and Underwood. When Helgeson determined that his parents were not in occupancy at the home in Garrison, he proceeded to drive to Underwood.

Helgeson stopped briefly to visit his cousins in Coleharbor, Darlene Stebbins and Kenneth Hultberg. Miss Stebbins observed that White Horse was sleeping in the front seat of the station wagon on the passenger's side. When they left the Hultberg residence, Helgeson was driving the station wagon, White Horse was sleeping in the front seat on the passenger's side, and Robert Roy was seated in the back seat of the station wagon. Approximately two miles north of Underwood, the station wagon veered into the opposite lane of traffic on U.S. Highway 83, before returning to its proper southbound lane of traffic. Keith James Borr was driving in the northbound lane of U.S. Highway 83 and he observed the white station wagon as it veered into the northbound lane of traffic before it returned to its proper southbound lane. The station wagon continued in the southbound lane until it approached Borr's blue 1974 halfton Ford pickup camper, at which time it swerved into the northbound lane of traffic and collided with the pickup camper driven by Borr. Before the collision, Borr observed two occupants in the front seat of the station wagon. When the collision occurred, the driver lost control of the station wagon and it traveled down the slope of the west ditch of Highway 83 before the driver regained control of the station wagon and drove it back onto the highway and stopped.

Borr observed two men leave the front seat of the station wagon and walk around to the back of it to open the tailgate on the station wagon. The men then entered the station wagon again and drove it south on the highway for a brief distance before stopping. Sheldon Summers at that time was driving south on Highway 83. After the accident, Helgeson sought to ride into Underwood with Summers, but Summers told Helgeson to stay at the scene of the accident. White Horse told Summers that Roy was badly hurt in the accident, and Borr told Summers to notify the McLean County sheriff's department of the accident. Before an ambulance and a deputy sheriff from McLean County arrived at the scene of the accident, Helgeson obtained a ride into Underwood to his parents' home. Deputy Sheriff Wilson Headrick was informed by White Horse that someone named Allen, who was employed at the All Seasons Arena of the State Fairgrounds at Minot, was driving the station wagon at the time of the accident. By checking with the employee files for the All Seasons Arena, Deputy Sheriff Headrick learned that Helgeson was the driver of the station wagon. Deputy Headrick contacted Helgeson at his parents' residence in Garrison and Helgeson voluntarily accompanied the deputy sheriff to the hospital in Garrison. As they entered the emergency room of the hospital, they met Dennis White Horse, who said to Helgeson, "You killed my buddy." Helgeson said nothing in response to White Horse's accusation. Robert Roy was killed in the accident. After White Horse left the hospital, Deputy Sheriff Headrick placed Helgeson under arrest for committing the crime of negligent homicide.

A complaint which charged Helgeson with committing the crime of negligent homicide was signed by Deputy Sheriff Headrick on May 5, 1980. Helgeson entered a plea of not guilty to the charge and his trial began on July 29, 1980. During the trial, the State called White Horse as one of its witnesses. He testified as to the events preceding the accident as well as to the events which transpired when he met Helgeson at the emergency room of the hospital. The following testimony was adduced at the trial concerning the accusation by White Horse:

"Q [by Mr. Romanick] Was this right at the entrance?

"A Right close to the entrance.

"Q Did you say something and did Allen say something at that time?

"A Yes. I told him that he killed my buddy.

"MR. MARTIN: Objection, your Honor. It is immaterial and prejudicial.

"Q Answer my question: Did you say something to Allen at that time?

"A Yes.

"Q What was the conversation at that time?

"A I told him: You killed my partner. And then I cussed at him.

"MR. MARTIN: I object to that, your Honor, as being immaterial and prejudicial to the defendant.

"THE COURT: The objection is overruled.

"Q What did Allen say to you at that time when you said that? Did he say anything?

"A No. Didn't say anything.

"Q He didn't respond at all?

"MR. MARTIN: Same objection, Your Honor."

Deputy Headrick also testified as to the confrontation between White Horse and Helgeson:

"A Yes. And we arrived at the hospital, went in the emergency entrance, and at that time Dennis Thompson, who is the funeral director at Garrison, was standing in the entrance, if I remember correctly. Dennis White Horse, his mother-in-law, his wife, and I am not sure if there was another woman with them, they were ahead of him. They were coming down the runway toward the emergency entrance, so I assume, leaving the hospital.

"Q And what transpired then?

"A Allen hailed Dennis, more or less called his name—said: Dennis. And Dennis said: My buddy is dead. And Allen answered: Is he gone? And then Dennis—at that time I stepped close to Dennis so I could see his face, and I asked him if that was the man who had been driving the car, and he indicated to me by nodding, and I am not sure if he spoke to me that that was the driver of the car involved in the accident.

And at that time he turned again to Dennis, and he said—

"Q To Dennis? You said: Dennis.

"A He turned again to Allen, and he said: You killed my buddy .... What's the matter with you?

"MR. MARTIN: Your Honor, objection. Immaterial and prejudicial. Same objection as before.

"THE COURT: The objection is overruled. The answer will stand.

"Q And after that statement was made, what did Allen say then?

"A As far as my recollection is, Allen didn't say anything."

Helgeson testified at the trial that he was not certain about who drove the car at the time of the accident. His recollection of the accident focused only upon his actions after the collision occurred. Helgeson admitted that he had driven the car from Coleharbor but his entire defense at trial was based upon the fact that the State had to prove who was driving the vehicle at the time of the accident. Because the testimony of Helgeson eliminated White Horse as the possible driver of the station wagon, the essential question to be answered at the trial was whether or not Helgeson or Robert Roy, the deceased, drove the station wagon at the time of the accident. The jury returned a verdict which found Helge-

son guilty of committing the crime of negligent homicide under § 12.1–16–03, N.D.C.C.

Two issues are presented for our consideration:

(1) Whether or not Helgeson properly objected to the admissibility of evidence on his silence in the face of White Horse's statement in order to raise the admissibility of the evidence as an issue on appeal.

(2) Whether or not the admission of White Horse's testimony about Helgeson's silence in the face of the accusation violated Helgeson's rights as guaranteed by the Fifth Amendment to the United States Constitution.

■ The requirements for an effective appeal on any proper issue are: (1) that the matter has been appropriately raised in the trial court so that the court can intelligently rule on it; and (2) that there be a valid appeal from the judgment. *State v. Bartkowski*, 290 N.W.2d 218 (N.D.1980); *State v. Johnson*, 231 N.W.2d 180 (N.D.1975). These requirements were established in order to prevent a defendant from inviting error upon the court in the hope that he could prevail on appellate review of the error. Rule 103, North Dakota Rules of Evidence, effectuates the requirements by providing, in pertinent part, as follows:

"RULE 103—RULINGS ON EVIDENCE

"*(a) Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

"*(1) Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; . . .

"*(d) Errors affecting substantial rights.* Nothing in this rule precludes taking notice of errors affecting substantial rights although they were not brought to the attention of the court."

■ The rule does not state the precise form which objections to evidence should take. However, at a minimum, the objection should give the opponent the basis of what is objectionable and bring the matter to the trial court's attention so that the court can rule on the same. These requirements are not met when counsel merely objects to evidence as being immaterial or prejudicial and does not apprise the court of the constitutional nature of the objection to the evidence. Rule 103, N.D.R.Ev., applies when an appellate court reviews a decision of a trial court or when a trial court rules on a motion for a new trial. The normal operation of the rule would foreclose our consideration of the important issue which is now being raised on appeal by Helgeson.

■ Although subdivision (d) of Rule 103, N.D.R.Ev. omits the words "plain error", it is obvious that the subdivision and the rule itself are concerned with such errors. Likewise, Rule 52(b), North Dakota Rules of Criminal Procedure, provides that obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. Plain or obvious error is an error not raised at trial, but which affects substantial rights of the accused and therefore is considered by the reviewing court. Two other types of error exist which contrast the plain or obvious error doctrine. These errors include harmless error, which is error raised at trial but found not to affect substantial rights; and prejudicial or reversible error, which is error raised at trial which is found to affect substantial rights. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court determined that a constitutional error involved in the case constituted plain error, but the Court did not establish that all constitutional error was harmful and constituted plain error. In the instant case, faced with the possibility that a constitutional error which constituted plain error might have occurred at the trial, we do not take cognizance of the improper nature of the objection. With these considerations in mind we now consider the second issue.

■ Helgeson contends that the district court committed error by admitting

into evidence the testimony as to the accusation made by White Horse to Helgeson and the silent conduct of Helgeson in response to the accusation. The testimony was admitted into evidence as a tacit admission. See *Starr v. Morsette*, 236 N.W.2d 183 (N.D.1975). In *Starr* we established that if a statement is made by another person in the presence of a party to the action, which contains assertions which, if untrue, the party would under all of the circumstances naturally be expected to deny, the party's failure to speak is receivable against him as an admission.[1] Several courts have found no irreconcilability between the rule and the privilege against self-incrimination. *Egan v. United States*, 137 F.2d 369 (8th Cir. 1943), *cert. den.* 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474; *State v. McAlvain*, 104 Ariz. 445, 454 P.2d 987 (1969), *cert. den.* 396 U.S. 1023, 90 S.Ct. 597, 24 L.Ed.2d 516; *State v. Samuel*, 521 S.W.2d 374 (Mo.1975); *State v. Pickett*, 37 Or.App. 239, 586 P.2d 824 (1978). The failure of the accused to respond to an official accusation may not be used as evidence against him. See *State v. Bragg*, 221 N.W.2d 793 (N.D.1974). However, in *Bragg*, the situation was somewhat different from the one in this case because in *Bragg* the defendant had been given *Miranda* warnings prior to the accusation being made. In the case of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court established that the cross-examination of a defendant concerning his failure to make exculpatory statements at the time of his arrest violated due process. However, evidence of a defendant's silence following arrest may be used in some instances to impeach a defendant's credibility. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Recently, in *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the United States Supreme Court held that use of the accused's pre-arrest silence regarding the crime for

which he was arrested and prosecuted, for the purpose of impeaching his credibility on cross-examination after he had taken the stand in his own defense, did not violate the Fifth Amendment. No violation of the Fifth Amendment occurred because the impeachment followed the defendant's own decision to testify.

■ Unlike the situation present in *Jenkins v. Anderson, supra*, the instant case involves the prosecution's use of testimony of the defendant's (Helgeson's) pre-arrest silence in its case in chief. The Fifth Amendment provides that "No person . . . shall be compelled, in any criminal case, to be a witness against himself . . ." U.S. Const. Fifth Amendment. In *Jenkins v. Anderson, supra*, the Supreme Court held that, where no *Miranda* warnings had been given and were not required, neither due process nor the privilege against self-incrimination forbids impeachment of a defendant's exculpatory testimony on the basis of his silence prior to arrest. In *Jenkins*, as in this case, the defendant was under no official compulsion to speak. In a concurring opinion written by Mr. Justice Stevens and joined in by Mr. Justice Stewart, they indicated that the privilege against compulsory self-incrimination is irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak. We subscribe to this view because the silence of a defendant following arrest and at trial involves the defendant's exercise of his constitutional privilege under the Fifth Amendment. These reasons are not applicable in a pre-arrest context when the defendant is silent in response to an accusation which he naturally would be expected to deny. Silence following *Miranda* warnings is ambivalent because it may be either an exercise of a defendant's constitutional right, or an admission. The *Miranda* warnings convey to the defendant the assurance that his silence may not be used against him. In the pre-arrest context the defend-

---

1. This form of evidence, which is commonly referred to as the "tacit admission rule" was recognized by the United States Supreme Court in *Sparf v. United States*, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895). The rule is not applicable in situations in which it is not reasonable to expect a response to an accusation.

ant has no such assurance in light of our decision in *Starr v. Morsette*, 236 N.W.2d 183 (N.D.1975).[2] Rule 801(d)(2)(ii), N.D. R.Ev.

■ The tacit admission offered against Helgeson at trial was not ambivalent in nature because Helgeson does not contend that he either did not hear or understand the accusation or that he had had no opportunity or ability to reply to the accusation. See 4 Weinstein's Evidence ¶ 801 (d)(2)(B)[01] (1980). Thus, we conclude that the district court committed no error by admitting into evidence the accusation and Helgeson's silence in response to the accusation. Because we adopt the rationale enunciated in Mr. Justice Stevens's concurrence in which he was joined by Mr. Justice Stewart in *Jenkins v. Anderson, supra*, we will quote from the concurrence, 447 U.S. at 241, 100 S.Ct. at 2131, 65 L.Ed.2d at 96:

"The Court holds that a defendant who elects to testify in his own behalf waives any Fifth Amendment objection to the use of his prior silence for the purpose of impeachment. As the Court correctly points out, this holding is squarely supported by *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054, in which the Court upheld the use of a defendant's failure to take the stand at his first trial to impeach his testimony on retrial. Nevertheless, I would not rely on *Raffel* because such reliance incorrectly implies that a defendant's decision not to testify at his own trial is constitutionally indistinguishable from his silence in a pre-custody context. But the two situations are fundamentally different.

"In the trial context it is appropriate to presume that a defendant's silence is an exercise of his constitutional privilege and to prohibit any official comment that might deter him from exercising that privilege. For the central purpose of the Fifth Amendment privilege is to protect the defendant from being compelled to testify against himself at his own trial. Moreover, since a defendant's decision whether to testify is typically based on the advice of his counsel, it often could not be explained without revealing privileged communications between attorney and client.

"These reasons have no application in a prearrest context. The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police. We need not hold that every citizen has a duty to report every infraction of law that he witnesses in order to justify the drawing of a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out. When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent. A different view ignores the clear words of the Fifth Amendment ['No person ... shall be compelled in any criminal case to be a witness against himself. ... U.S.Const. Amdt. V.] ... Consequently, I would simply hold that the admissibility of petitioner's failure to come forward with the excuse of self-defense shortly after the stabbing raised a routine evidentiary question that turns

2. We are not unmindful of the fact that the case of *Starr v. Morsette*, 236 N.W.2d 183 (N.D. 1975) was a civil case and that, therefore, it differs from the criminal nature of this case. Nevertheless, the policy reasons which are used to justify the use of tacit admissions as evidence are equally applicable to criminal cases, at least in the situation where the accusation and the ensuing silence occur in a pre-arrest context. Even in the pre-arrest context, the danger of undue prejudice may outweigh the probative value of the evidence. Such a situation would arise if the defendant did not have the ability or the opportunity to respond to the accusation. For a recent case concerning the problems associated with the substantive use of a defendant's pre-arrest silence, see *United States v. Gonzales Caro*, 637 F.2d 869 (2d Cir. 1981), Vol. 28, No. 1, The Criminal Law Reporter 2451 (February 18, 1981).

on the probative significance of that evidence and presented no issue under the Federal Constitution."

The closing arguments of the State and counsel for Helgeson were not transcribed and, therefore, we have no indication of how the evidence was summarized before the jury. No jury instructions were given on the evidentiary effect of tacit admissions. No contention was made by Helgeson that he was in custody at the time that White Horse made the accusation and that, therefore, he was entitled to the *Miranda* warnings. *State v. Hagge*, 224 N.W.2d 560, 566 (N.D.1974). Substantial evidence existed by which the jury could establish that Helgeson drove the station wagon at the time of the accident. This evidence consists of the fact that Helgeson's relatives observed him drive the car as he left Coleharbor; that only Helgeson had a reason to drive to Underwood because White Horse had not been willing to drive there; that Borr observed two people in the front seat of the station wagon at the time of the accident; and it was established at trial that White Horse and Helgeson were in the front seat of the station wagon at the time of the accident.

For reasons stated in this opinion the judgment of conviction is affirmed.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.