On April 10, 1998, Appellant, Sim J. Maggard, was convicted by a jury on charges of murder (with a firearm specification) and abduction. These charges arose from events that occurred on November 15 and 16, 1997, and ended in the shooting death of Dean Ritenour. During trial, Maggard claimed that he shot Ritenour in self- defense, but the jury decided otherwise. Maggard now appeals, raising the following assignments of error:
I. The trial court denied Appellant due process of law in violation of the United States and Ohio Constitutions when it refused to allow him to present evidence of how he reacted nonviolently in prior abusive settings, when that evidence was a critical component of his self-defense defense.
II. The trial court committed prejudicial error when it refused Appellant's request to instruct on the lesser included offense of voluntary manslaughter.
III. The trial court erred in violation of the Due Process Clause when it failed to grant Appellant's motion for mistrial after the prosecution commented on the fact that Appellant did not speak to the police officers after his arrest.
After considering the record and the applicable law, we find the third assignment of error has merit. Accordingly, the defendant's conviction is reversed and this case is remanded for a new trial. A discussion of our opinion follows.
 I
The first assignment of error is based on Maggard's claim that he should have been allowed to present evidence of his nonviolent reaction in former abusive settings. In this regard, the record indicates that defense counsel tried to question the victim's girlfriend, Tara Baker, about abuse Tara had received from her husband, an individual named Rodney Baker. According to the defense, the point of this evidence was to show that the defendant typically reacted to violence in a non-violent fashion. Specifically, Maggard had gone to high school with Tara and Rodney Baker. At times when Rodney became abusive to Tara, Maggard stepped in and received the abuse for her without retaliating because he knew it would eventually stop. Allegedly, Maggard followed the same pattern when his mother was abused by her husband. By contrast, when Maggard was presented with threats from Dean Ritenour that gave Maggard actual fear for his safety and a belief that he would be killed unless he acted, Maggard responded with violence. The trial court refused to allow this evidence, following the rule that evidence of a character trait (like peacefulness) can be admitted, but specific acts are not admissible unless the trait is an essential element of a claim or defense. The trial court likened Maggard's claim to a partial battered roommate syndrome or a post-traumatic stress disorder. However, the court rejected the claim because the specific background or foundation for these syndromes was not established.
According to the trial testimony, Tara Baker met Dean Ritenour at a bar on July 4, 1997, and moved in with Ritenour the next day. At the time, Tara was still married to Rodney Baker. When Tara moved in with Ritenour, Maggard was living in Hamilton, Ohio, with Tara's sister. However, in August, 1997, Maggard needed a place to stay because he and Tara's sister had split up. As a result, Maggard moved into Ritenour's home and began working in a carpet-cleaning business that Ritenour owned. Maggard testified that when he first met Ritenour, Ritenour acted normal and was a "good guy." Subsequently, Maggard's impression began to change. When Ritenour drank and used drugs, he got mad and did things for no reason, like shooting his gun. Ritenour used to boast about trouble he had with the law, including DUI and domestic violence charges. Ritenour told Maggard he had barricaded himself in his house once for a few hours and would not come out. Eventually, the house was surrounded by the police. Additionally, Ritenour told Maggard that he had shot out his TV a few times because he got mad at an ex-fiancee or girlfriend.
About two weeks before November 16, 1997, Ritenour found out that Tara and Maggard had sex three days before Tara and Ritenour had first met. According to Maggard, Ritenour became mean towards him after finding this out. Ritenour tried to physically assault Maggard by throwing a flashlight at him, but missed. The week before the shooting, Ritenour was not himself at all. He swore at Maggard, did not want to go places with Maggard, and did not work with him or smoke pot with him as had been their custom previously. During that week, Ritenour also asked Maggard to move out because Ritenour had to serve a ten-day sentence in jail for a DUI. Ritenour said he thought it was best for Maggard to leave while he was in jail, but did not give a reason. At that particular point, Maggard did not fear for his safety.
The shooting occurred in the early morning hours of Sunday, November 16. On Saturday, November 15, Maggard and Ritenour worked two carpet-cleaning jobs in the morning and came home for lunch like they normally did. Maggard then worked two more jobs and Ritenour stayed at home. After finishing work, Maggard came back to the house, smoked a joint or had a beer, and left to go see a friend. Before leaving, Maggard did not have any conversation with Ritenour about moving out, nor were there any problems. Later that night, Maggard got back to Ritenour's house about 10:00 p.m. At that time, Ritenour looked different. His eyes were "messed up" and he was mean-looking. During this encounter, Ritenour told Maggard to get out or he would kill him. Ritenour and Tara then left the house. Maggard testified that he was afraid at this point. As a result, he decided to leave and began packing his belongings. While he was packing, he noticed Ritenour's gun on a table.
Before Maggard was able to finish packing, Tara and Ritenour returned home. Tara came in the house and told Maggard that he had to "get out now" because Dean was going to kill him. Maggard ran in the living room, remembered the gun sitting on a table, and picked it up. When he turned around, Ritenour was there. Maggard swore that Ritenour had a gun in his hand. Maggard was panicked because of what Tara had said and fired one shot. The shot struck Ritenour in the face, severed the brain stem, and instantly caused death. After Maggard shot Ritenour, he picked up the rest of his clothes, walked outside, and got in his car. He testified that Tara tried to give him money and wanted to follow him in Ritenour's car, but he refused. Subsequently, Maggard threw the gun (a .38 snub-nosed revolver) away.
Tara's story was obviously different. Tara testified no one threatened to kill Maggard, no fighting or arguing had taken place, and no one had asked Maggard to leave the house the day or evening of the shooting. According to Tara, Ritenour did not have to begin serving his ten-day DUI sentence until the end of November. Ritenour did ask Maggard to move out for that ten-day period, because neither Ritenour nor Tara thought it looked right for Maggard to stay in the house alone with Tara. Ritenour even offered to pay for a hotel room for Maggard.
According to Tara, no problems occurred on Saturday and she was not aware of any problems between the two men. When she and Ritenour originally left the house on Saturday evening, Maggard was still there. After leaving the house, Tara and Ritenour first went to a tattoo parlor, where Tara got a tattoo. Next, they went to the Avenue Bar and had some drinks. From there, they went to a friend's house, where Ritenour purchased some Xanax pills. Then, they went home. Maggard was not there at that time and nothing had been packed. After staying home for a little while, Tara and Ritenour went to Meijer around 10:00 p.m. to get a receiver for their stereo. Tara denied that Maggard came home while they were there, and also denied that any argument occurred.
Tara and Ritenour shopped at Meijer for about two hours and returned home at approximately 12:30 a.m. Because Ritenour was carrying something, Tara unlocked the front door. Outside, and right next to the front door was a motion detector shaped like a frog that croaked when people walked by. After Tara unlocked the front door, she walked into the house. When she got a little bit past the front door, she saw Maggard standing behind the door with his hands behind his back. As Ritenour walked in, Tara saw Maggard pull his hands up from behind his back. She also saw a gun. Tara was only able to yell, "Watch out," before Maggard shot. According to Tara, Maggard pulled the gun up, looked at Ritenour, smiled, and pulled the trigger.
Tara testified that Ritenour did not have a gun. Instead, all he had in his hands when he came in the house were a six-pack of batteries and a king-size Peppermint Patty. After being shot, Ritenour fell down right by the front door. Tara went over and kneeled beside Ritenour to help him. However, Maggard jerked her up by the arm and forced her outside. Maggard told Tara to get in his car, but she said she could not get in because the car was full of clothes. At that point, a car came up the street, and Maggard left without Tara. Tara then went back into the house and called 911.
That evening, before shooting Ritenour, Maggard had visited Richard Lambert, who was friends with both men. Lambert was aware of the conversations that had taken place about where Maggard would stay during Ritenour's jail sentence. According to Lambert, Maggard did not like the arrangement of going to a hotel. Instead, Maggard wanted to either stay at Ritenour's house or go back to Kentucky, where he had previously lived. Maggard did not express anger with Ritenour, but was upset that Ritenour wanted him to be out of the house for ten days. When Maggard left Lambert's house, he told Lambert he was going to a bar called the Living Room, but would call him the next day. Later that same night, Maggard called Lambert to say goodbye. During this conversation, Maggard said that he and Ritenour had "just had words." Maggard said Ritenour was not going to let him stay at the house for the ten days, so Maggard was going home to Kentucky. Maggard did not say that Ritenour had told him to leave that day, nor did he say that he was scared or that Ritenour had threatened to kill him.
This conversation with Lambert took place some time after 11:00 p.m. Neighbors of Dean Ritenour saw a man loading clothing into an automobile around 11:00 p.m. At about 11:45, neighbors heard a gunshot outside the Ritenour house. One neighbor saw a man fitting Maggard's description shoot a gun at a 45 degree angle towards the ground, right in front of the house. Maggard admitted at trial that he had Dean's .38 caliber gun during the last trip he made out to the car, and fired it into the sidewalk area.
No weapon of any type was ever found in the house or on Ritenour. One of Maggard's cell-mates testified at trial and indicated that Maggard said he shot Ritenour because he was angry. Supposedly, the two were embroiled in a continuing cycle in which Ritenour supplied Maggard with drugs and then had Maggard work off the debt in the carpet-cleaning business. Apparently, Maggard often either drank and passed out or was not aware of what had happened the night before. When Maggard regained consciousness, he was told by Ritenour that he owed a certain amount and had to work it off. Maggard was upset because he felt Ritenour charged him extra and basically took advantage of him. Maggard was angry with Ritenour and told his cell- mate that "I shot that son of a bitch." However, the evidence at trial also revealed that Maggard had a reputation in the community for not being violent.
The defense did not attempt to put on expert testimony indicating that Maggard suffered from some type of post-traumatic stress disorder due to a background of abuse, nor does the record contain any indication that Maggard was ever examined by a psychologist. Under the circumstances, we agree with the trial court that no foundation was established for the admission of the evidence of how Maggard reacted to abuse. Furthermore, based on the current facts, the evidence appears to be irrelevant.
Evid R. 405 (B) states that proof of specific conduct may be admitted "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense." To prove self-defense, the defendant must show:
 (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm; and (3) that his only means of escape from such danger was in the use of such force.
State v. Baker (1993), 88 Ohio App.3d 204, 208. In Ohio, this test is considered subjective, and the defendant's state of mind is crucial. See, e.g., State v. Koss (1990), 49 Ohio St.3d 213,215-16.
As was noted, defense counsel asserted at trial that Maggard normally reacted non-violently to violence, presumably because he believed he was in no real danger and the violence would end with no real harm to Maggard or others. However, in an instance where Maggard believed his life was actually threatened, he reacted uncharacteristically, with violence. The purpose of admitting the evidence about past abuse was obviously to buttress Maggard's claim that he believed his life was threatened.
The connection between Maggard's prior response to the physical abuse of others and his response when he was the object of the threat is not obvious. In fact, on its face, the defense theory makes little sense. Specifically, a person's avoidance of violence in one situation does not necessarily have anything to do his choice of violence in another situation, i.e., many explanations for such conduct are possible. However, in certain situations, a connection may be made between past actions and conduct that seems unrelated to or inconsistent with normal experience. For example, battered women often act contrary to normal experience. In this regard, the Ohio Supreme Court noted in Koss that:
 "[e]xpert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any 'common sense' conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage."
49 Ohio St.3d at 216 (citations omitted).
Likewise, testimony about post-traumatic stress disorder has been presented as part of a self-defense claim, to explain reactions that normally would not satisfy the requirements for the defense. For example, in State v. Purcell (1995), 107 Ohio App.3d 501, the defendant appeared to have overreacted, even under the defense version of the facts, i.e., the defendant shot an unarmed man who had simply grabbed the defendant's girlfriend by the hair and had threatened her. The defense theory was that the defendant's post-traumatic stress disorder, caused by a stint in Vietnam, made him "overreact in stressful situations." Id. at 505. To support this claim, testimony was presented from a psychologist, who described post-traumatic stress disorder as "an anxiety disorder that has psychological and physical symptoms which occur after a person undergoes an overwhelming stress." Id. at 504. According to the psychologist, a post-traumatic stress disorder and the stress resulting from the particular confrontation with the victim caused "hyperarousal" in the defendant. These factors also caused the defendant to have a "misperception" that his life or the life of his girlfriend was in imminent danger. Although "hyperarousal" and "misperception" would not normally be interpreted as evidence of a bona fide belief that one is in imminent danger of death or great harm, they could satisfy this requirement if they are appropriate reactions in the context of a disorder.
Such a connection was not made in the present case, however. Moreover, the past acts of abuse appear to be irrelevant, since they did not involve situations even remotely similar to the events surrounding Ritenour's death. In particular, the proffered evidence would not have shown how Maggard reacted when his own safety was threatened. Instead, it would have shown only how Maggard reacted when the safety of others was threatened. Accordingly, because the trial court correctly refused to admit evidence of Maggard's past nonviolent responses to an aggressor's abuse of others, the first assignment of error is overruled.
 II
In the second assignment of error, Maggard contends the trial court erred in refusing to charge the jury on the lesser included offense of voluntary manslaughter. The Ohio Supreme Court stated in State v. Shane (1992), 63 Ohio St.3d 630, that voluntary manslaughter is not a lesser included offense of murder, but is an inferior degree of the offense of murder. Nonetheless, the court concluded that:
 the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought. * * *
 Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter.
Id. at 632. According to the voluntary manslaughter statute:
 [n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another.
R.C. 2903.03(A). For purposes of deciding if provocation is "reasonably sufficient to bring on sudden passion or a sudden fit of rage," an objective standard must be applied. Shane,63 Ohio St.3d at 634. Furthermore, if this objective standard is met:
 the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. It is only at that point that the " * * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * * " must be considered. * * * If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. In that event, the objective portion of the consideration is not met, and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted.
Id. at 634.
In opposing a voluntary manslaughter instruction at trial, the State argued that voluntary manslaughter involves the sudden heat of passion that overcomes a person's will. By contrast, however, the alleged threats against Maggard were made two hours before the shooting. The trial court did not focus on this point, but instead found an absence of evidence to support the instruction. In this regard, the court commented that:
 "[m]y recollection of the facts is that there's no, absolutely no evidence that the deceased's hand was even raised or that he actually saw a gun. In light of that, there's not sufficient evidence for the voluntary manslaughter. That will not be given."
We interpret the trial court's remarks to mean that, objectively, the evidence of provocation was not "reasonably sufficient to bring on sudden passion or a sudden fit of rage."
As an initial point, we note that the trial court's evidentiary findings were incorrect. First, Maggard did testify that the victim raised his hands as he came in the door. Furthermore, although a gun was never found at the scene, Maggard did, in fact, testify that he actually saw a gun in the victim's hands. Coupled with the threats that had allegedly been made, one could find objective evidence of provocation, that if believed, was reasonably sufficient to bring on sudden passion or a sudden fit or rage. Where the argument fails, however, is in connection with the second prong, i.e., the "subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." Shane, at 634. In this regard, Maggard's own testimony was simply that he was afraid and that he shot in self-defense.
In a similar situation, we found sufficient evidence of provocation, but felt the defendant's testimony negated any possibility that a jury could find he was under the influence of sudden passion or a sudden fit of rage. See, State v. Keeton
(Dec. 11, 1998), Clark App. No 98CA13, unreported. In Keeton, the defendant testified that he was not in a rage or passion, but was instead scared and acted in self-defense. Id. at p. 3. See also, State v. Platt, (Dec. 16, 1998), Wayne App. No. 18835, unreported (affirming refusal to give voluntary manslaughter instruction where defendant fired shot at victim because defendant was afraid victim would hurt defendant or friends. Defendant did not fire due to anger or passion caused by victim's provocation).
Under the circumstances of the present case, even if an objective basis for provocation existed, we find no evidence that Maggard "actually was under the influence of sudden passion or in a sudden fit of rage." Shane, 63 Ohio St.3d at 634. Thus, while the trial court erred in its factual findings, it did not err in refusing to give a voluntary manslaughter instruction. Accordingly, the second assignment of error is overruled.
 III
In the third assignment of error, Maggard claims the trial court erred in failing to grant a motion for mistrial. This motion was made after Kettering Police Detective, Glen Gentry, testified on redirect examination that Maggard did not tell police about his self-defense claim. The trial court overruled the motion, finding the prosecutor's question proper in light of matters raised by the defense during cross-examination.
As support for this assignment of error, Maggard cites Doylev. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, and other cases that prohibit comment on the defendant's exercise of his right to be silent. The general principle arising from these cases is that the State may not use the defendant's post-arrest silence for impeachment purposes if Miranda assurances have been given. In this context, the following facts in the present case are pertinent. First, Detective Gentry was called by the prosecution during its case-in-chief to testify about the crime investigation. Specifically, Gentry helped search for the murder weapon on property in Kentucky that Maggard's mother owned. He also interviewed several witnesses, including Gregory Reeves (the cell-mate who testified against Maggard at trial). Additionally, Gentry had contact with Maggard when Maggard came with his mother to the police department two days after the shooting.
Although the police were on the scene within minutes of the shooting, Maggard had already left. When Maggard left the scene, he intended to drive to Kentucky, but stopped at a Meijer parking lot in Hamilton, Ohio. At that point, Maggard fell asleep because he was too tired to drive any farther. After he awoke, he continued on to Kentucky, where he stayed one day before returning to Kettering, Ohio. Maggard then turned himself into the Kettering police. The record does not indicate when, or ifMiranda warnings were given to Maggard. However, Maggard did not make any statements to the police about the shooting.
During trial, the State referred to Maggard's silence at several points in the record. First, during the prosecution's direct examination of Detective Gentry, the following exchange occurred:
 Q. (By the prosecutor): All right. Was there a time you eventually came in contact with this defendant regarding this murder case?
 A. Yes. He came back to the police department with his mother.
 Q. At that time, did the defendant bring it [the gun] in and hand it to you and say, Hey detective, here's the murder weapon. And here's the weapon I used.
A. No, sir.
Q. Did he do that?
A. No, sir.
 Q. Did he drive up in his car and say: Oh, by the way, here's the red Honda I skipped town in?
A. No, sir.
Q. He didn't do that?
A. No, sir.
Q. Did he tell you the place where he had it hid?
A. No, sir.
Q. Do you know where the car was he escaped in?
A. No, sir.
The defense made no objection to these questions. Later, during the prosecutor's redirect examination of Detective Gentry, the following further exchange occurred:
 Q. (By the prosecutor): Now, we met with Mr. Reeves; did we not, you and I, and Mr. Reeves?
A. Yes, sir.
 Q. And Mr. Reeves told us what he told the ladies and gentlemen of the jury today, did he not?
A. Yes, he did.
 Q. He also told us about the alleged version of the defendant, that he was mad at Mr. Ritenour because he had given him drugs and he wanted him to pay for it. He being the defendant. He wanted the defendant to pay for those drugs?
A. Yes.
Q. He told us that, did he not?
A. Yes.
 Q. You know, it is interesting. You were asked —well, did you have any information after the shooting that the reason the shooting took place was because the defendant was mad because he was going to be kicked out the same day, or on November 15th or 16th.
A. On the same day.
 Q. On the 15th. He was mad because he was being kicked out of the residence, according to his version, on the 15th. And that Dean was going — that he was going to be gone. And when Dean came back and he was still there, Dean was going to do something to him. You didn't have that information, did you?
A. No.
Q. Because it didn't happen that way.
A. No.
Q. Miss Baker didn't tell you that was what happened?
A. No.
 Q. No other witnesses stated: well, the reason the shooting took place, was because this defendant shot and killed Mr. Ritenour because Mr. Ritenour wanted him to leave and he hadn't left?
A. No, sir.
Q. That's his version?
A. Correct.
 Q. So there would be no reason to write it in your report when you did your initial investigation, would there?
A. No, sir.
Q. The defendant never told you that, did he?
A. No sir.
Q. You gave him an opportunity to talk to you, didn't you?
At this point, the defense objected and moved for a mistrial, but the court overruled the motion. While the court felt the prosecutor's question was "inartfully phrased," the court also found it was a proper response to a question the defense had asked on cross-examination. The court did not specify which defense question supported its ruling, but the prosecutor had just given the following explanation when arguing against the motion for mistrial:
 Mr. Franeschelli: What I inquired was whether this defendant gave him the information that this defense lawyer just asked him about. In other words, the only place he could have gotten this information was from this defendant. And he did not receive it; therefore, it is not in his reports. You inquired into it.
Based on these comments and the excerpted testimony quoted above, the question allegedly referred to by the defense on cross-examination would have been whether the defendant's version of the shooting could be found in the investigation report. Maggard's version, of course, was that he shot Ritenour in self-defense following Ritenour's threat about what would happen if Maggard did not leave the house that night. Also part of Maggard's version was Tara's action in yelling that Ritenour was going to kill Maggard, and the fact Maggard saw a gun in Ritenour's hands. Contrary to the prosecutor's statement, however, defense counsel did not ask why the defendant's version of the events was missing from the investigation report, nor did defense counsel even imply that was the case.
Instead, defense counsel asked Gentry about a limited number of matters, none of which addressed the absence of the defendant's version of the shooting from the investigation report. Specifically, Gentry was asked about his contact with Reeves (the cell-mate) and about the fact that Reeves did not mention drugs or the Avenue Bar during his initial interview with Gentry. (As was noted earlier, Reeves testified that Maggard was angry with Ritenour over excess charges for drugs. Reeves also testified that Maggard went to the Avenue Bar on Saturday night, with the purpose of killing Ritenour, but Ritenour was not there.)
Additionally, defense counsel asked Gentry if the investigation report included any reference to Ritenour's offer to put Maggard up in a hotel for a few days. Gentry admitted that the offer was not mentioned in the investigation report. However, he did recall being told about the offer during his investigation. This was not a part of the defendant's version of events and would not have been something the defendant should have told the police. In fact, Maggard denied that the offer was made.
On cross-examination, defense counsel also asked Detective Gentry if he found any evidence indicating that Maggard was upset with Ritenour before the shooting. In this regard, Gentry testified that he had gotten statements to that effect from two of Maggard's cell-mates and from Rick Lambert. In particular, Lambert told Gentry that Maggard was upset, and that Maggard was afraid of Ritenour. Lambert also told Gentry that Maggard did not like the way Ritenour was treating him and was not happy about having to leave his home. Again, the defense did not imply during cross- examination that these statements were missing from the investigation report.
Thus, the record does not support the trial court's finding that the prosecutor's questions were a proper response to defense cross-examination. Furthermore, Gentry's testimony was elicited during the State's case-in-chief, not during the defendant's cross-examination.
The other reference to Maggard's failure to tell the police his version of events took place during closing arguments. At that point, the prosecutor said:
 This defendant did go to Hamilton, Ohio. To dispose of the gun maybe. Throw it in the lake somewhere? Maybe. We don't know where the gun is because, because of the defendant's own actions. He hid the gun. Those are the actions of a guilty person not an innocent person.
 Well, he went straight home to his mother's house, where he lives with his mother, in Kentucky and he turned himself in. Well, folks, that's great. But that wasn't the same day.
 What did he do after he shot Dean? He ran. He escaped. He fled the scene of the crime. If he's so innocent and shot a human being in self-defense, wouldn't you want to stay there? Call the police. Explain what happened at the time to the police? Not run and hide the gun. Not run and hide the car. Not go to Hamilton, Ohio, and hide out over there.
 It's a smoke screen to say, well, he rushed home to Kentucky and he turned himself in. Well, that's not quite true, because that's not quite the sequence of events, is it?
Again, the defense did not object to these comments.
In Doyle, the Supreme Court held that using a defendant's silence at the time of arrest and after receiving Miranda warnings violates the Due Process Clause of the Fourteenth Amendment.426 U.S., at 619, 96 S.Ct., at 2245, 49 L.Ed.2d, at 98. Subsequently, in Jenkins v. Anderson (1980), 447 U.S. 231, 100 S.Ct. 2124,65 L.Ed.2d 86, the Supreme Court said that impeachment by use of pre-arrest silence does not violate the Constitution. Instead, the court held that each state is free to fashion "evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial." Id. at 239, 100 S.Ct., at 2130,65 L.Ed.2d, at 96. In Jenkins, the court also distinguished Doyle, based on the fact that Miranda warnings "inform a person that he has the right to remain silent and assure him, at least implicitly, that his subsequent decision to remain silent cannot be used against him." Id. at 240, 100 S.Ct., at 2130,65 L.Ed.2d, at 95. By contrast, fundamental unfairness is not present if no governmental action induces an individual to remain silent. Similarly, in Fletcher v. Weir (1982), 455 U.S. 603,102 S.Ct. 1309, 71 L.Ed.2d 490, the Supreme Court found Doyle inapplicable where Miranda warnings were not received (or at least the record did not show they were received) during the time the defendant remained silent immediately after arrest. Id. at 605,102 S.Ct., at 1311, 71 L.Ed.2d, at 493. Thus, the court held, as it had inJenkins, that states may resolve this issue under their own rules of evidence without violating the Due Process Clause.
Some cases applying Doyle have focused on a pure "pre-Miranda/post-Miranda" classification, rather than on whether the defendant's silence took place "pre-arrest" or "post-arrest." See, State v. Sabbah (1982), 13 Ohio App.3d 124, 128. However, the Ohio Supreme Court has not construed Doyle quite so narrowly. In State v. Combs (1991), 62 Ohio St.3d 278, the court found Doyle
applicable even where the defendant did not receive Miranda
warnings. Specifically, in Combs, the defendant shot two women and was then wounded by a police officer who happened to arrive on the scene as the defendant was trying to leave. Id. at 278. That officer retreated to reload and the defendant was found by another officer, who asked him what had happened. The defendant said, "The guy shot me." Id. at 279. Later, when the defendant was being loaded into an ambulance, the second officer again asked him what had happened. At that time, the defendant said, "Talk to my lawyer." No Miranda warnings had been administered before these questions were asked. Id.
At trial, the defendant claimed he was too intoxicated either to form the intention to kill the victims or to plan and calculate their deaths. His statement, "talk to my lawyer," was then admitted as proof of prior calculation and design. Although defense counsel had failed to object at trial, the admission of the statement was then challenged on appeal. The State responded to this challenge by arguing that penalties for a defendant's exercise of silence are disapproved only if Miranda warnings "promise no adverse consequences from silence." Id. at 281. However, the Ohio Supreme Court disagreed, stating that:
 at the point when Combs was placed in the ambulance, we find that Combs was in custody and had a right to remain silent, consult a lawyer, and receive a Miranda warning. When he arrived at the scene, Officer Ventre personally took the shotgun from Combs; there were two women dead from shotgun blasts in the adjacent car; and Ventre had been at the scene for some ten to fifteen minutes. Ventre's questioning, without a Miranda warning, violated those rights. Using Combs' comment, "talk to * * * [my] lawyer," in evidence at trial also violated his rights as viewed by Griffin v. California, supra [the right not to be penalized for exercising the right to remain silent and to consult an attorney].
Id. at 281 (parenthetical material added). Despite the constitutional violation, the court refused to find "plain error" and affirmed the conviction because other compelling evidence established purposefulness and prior calculation and design. Id.
As we mentioned before, the record does not explicitly reveal when or if Maggard received Miranda warnings. However, because Tara Baker was present at the time of the shooting and immediately called the police, Maggard was obviously the only suspect by the time he turned himself into the Kettering police. Like the defendant in Combs, Maggard had a right at that point to right to remain silent and to receive Miranda warnings. More important, Maggard's right not to be penalized for remaining silent was violated by the prosecutor's comments, which included reference to the fact that Maggard did not tell the police the location of various evidence and did not tell the police his version of the events surrounding the shooting.
As an additional point, even if Ohio had not interpretedDoyle broadly, the present case differs from Doyle, Jenkins, andFletcher. Specifically, the improper questions and comments in this case were not used for impeachment purposes during the cross-examination of the defendant. Instead, they were used during the direct and redirect examination of a police detective in the State's case-in-chief. In this regard, the present case is more like Wainright v. Greenfield (1986), 474 U.S. 284,106 S.Ct. 634, 88 L.Ed.2d 623, where the defendant's "silence was used as affirmative proof in the case in chief." Id. at 292,106 S.Ct., at 639, 88 L.Ed.2d, at 630. Of particular interest to us is the Supreme Court's comment in Wainright that in such situations, "[t]he constitutional violation might * * * be especially egregious because unlike Doyle, there was no risk `that exclusion of the evidence [would] merely provide a shield for perjury.'" Id., n. 8. We agree that this type of violation is troublesome, especially where, as here, the evidence appears to be offered solely to imply that the defendant is guilty because he did not assert his innocence or make statements to the police.
In a similar situation, the Tenth District found the admission of remarks about the defendant's silence "highly prejudicial." See, State v. Russell (Dec. 20, 1988), Franklin App. No. 88AP457, unreported. In Russell, a police officer was asked during the State's case about how the defendant responded when he was told he had been charged with rape. The exchange in question took place after the defendant was arrested, but beforeMiranda warnings were given. In answer to the prosecutor's question, the officer said the defendant's only response was to ask how much bail money was required. Although an objection was made at trial to the admission of this evidence, the objection was overruled. Subsequently, on appeal, the defendant claimed that the comment on his silence violated Doyle.
In considering the issue, the Tenth District first distinguished Doyle on the basis that no Miranda warnings had been given. However, the court stressed that this distinction did not mean the testimony was admissible. The court then focused onFletcher's holding, i.e., that states may allow cross-examination for impeachment purposes when the affirmative assurances embodied in the Miranda warnings are absent. Id. at p. 6. However, the Tenth District also distinguished Fletcher because the evidence inFletcher was used on cross-examination to impeach the defendant's testimony. By contrast, the evidence in Russell was "entered in the state's case-in-chief to raise an inference of guilt because the defendant failed to protest his innocence." Id. As we mentioned above, the court then found that "[t]he introduction of the officer's testimony in the state's case-in-chief was highly prejudicial." Id. The result in Russell was that the judgment was reversed and the case was remanded for a new trial.
Later, in State v. Ospina (1992), 81 Ohio App.3d 644, the Tenth District reaffirmed Russell, stating that:
 [w]e clarify that the rule of Fletcher, * * * which permits testimony of a defendant's post-arrest silence during a custodial interrogation without the benefit of Miranda
warnings allow[s] such testimony to be elicited by the prosecutor only on cross-examination of a defendant who takes the stand to establish a prior inconsistent statement. These cases fall within the impeachment exception to the exclusionary rule. A defendant's post-arrest silence without the benefit of Miranda warnings cannot be admitted by the state during its case in chief as substantive evidence because of the exclusionary rule. Therefore, we reaffirm our prior decisions in State v. Gentry (Nov. 19, 1991), Franklin App. No. 91AP-370, unreported, * * * and State v. Russell
(Dec. 30, 1988), Franklin App. No. 88AP-457, unreported, * * * urged by appellee to be incorrect. In the instant case, the exclusionary rule prohibited introduction by the state in its case in chief of appellant's silence which occurred during the sheriff's custodial interrogation of him because Miranda warnings should have been administered.
Id. at 650, n. 3.
In Russell, the court did not explicitly say why evidence about the defendant's silence was highly prejudicial, nor was any particular standard used to assess the effect of the evidence. Instead, the court seems to have found the admission of the evidence prejudicial per se. A convincing argument can be made, based on the timing of the State's actions, that such evidence is prejudicial per se. Specifically, the presumption of innocence and the prohibition against self-incrimination are well-established safeguards in our criminal justice system. In contrast to these safeguards, if substantive evidence of silence is introduced before the defendant testifies, the defendant is forced into an untenable position. He must either abandon his right to the presumption of innocence and allow the implication of guilt to stand, or give up his right not to testify. On the other hand, if the defendant chooses freely and without coercion to speak on his own behalf, fairness dictates that his credibility can be challenged by prior inconsistent behavior. Even then, however, Doyle prohibits impeachment by post-arrest silence if the defendant has receivedMiranda warnings.
We need not decide if a prejudice per se standard should be used, since the conviction must be reversed even if we use the standard typically applied to constitutional violations. In order "to find that a constitutional error was harmless, we must find beyond a reasonable doubt that the error did not contribute to the verdict." State v. Bumgardner (June 7, 1996), Greene App. No. 95 CA 11, unreported (citations omitted). The Ohio Supreme Court has further explained that "`error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt.'" State v. Moreland
(1990), 50 Ohio St.3d 58, 65 (citation omitted).
While the remaining evidence in the present case is sufficient to support the conviction, it is not overwhelming. In this regard, we note that the verdict depended heavily on the jury's choice between the credibility of two witnesses. And, because some evidence existed to support Maggard's version of events, we cannot find beyond a reasonable doubt that the error did not contribute to the verdict. In particular, we point to the following matters. First, Maggard was a very small, slightly built man (5'6" or 5'7", 115 pounds), while Ritenour was quite a bit larger (6'1", 173 pounds). Maggard appears to have had no previous criminal history or history of violence. By contrast, Maggard's testimony about Ritenour's history of unpredictable violence was supported by the testimony of Baker, who admitted that Ritenour had discharged his gun for no reason in the house. Both Baker and Lambert also admitted that there were bullet holes in Ritenour's house, again supporting Maggard's testimony about Ritenour's tendency to be unpredictably violent.
As an additional point, Lambert's testimony cast some doubt on Baker's credibility. As we mentioned earlier, Maggard testified that when he came back to the house around 10:00 p.m. that evening, he was threatened by Ritenour. Although Baker was with Ritenour all evening, she denied seeing Maggard at 10:00 p.m., or at any time that night until about 12:30 a.m. Baker also denied that any argument took place or that any threats were ever made. By contrast, Lambert testified that when he spoke to Maggard on the telephone around 11:15 p.m., Maggard told him that he and Ritenour had "just had words." Maggard had not mentioned any such argument when Lambert saw Maggard earlier in the evening. Because Maggard left Lambert's house some time between 8:30 and 9:30 p.m. that evening, the only time Maggard and Ritenour could have "just had words" would have been when Maggard returned home around 10:00 p.m. As an additional point, Maggard's description of Ritenour's eyes at 10:00 p.m. as looking "messed up," is consistent with the fact that Ritenour had marijuana, alcohol, and three times the therapeutic level of Xanax in his system at the time of death.
And finally, Lambert's testimony provided other support for Maggard's "version," because Lambert verified that Maggard was afraid of Ritenour. We express no opinion on the weight to be given any of this evidence, or on the ultimate conclusions that might be reached, as Maggard's version of events obviously conflicted with other evidence. These are matters for the jury to decide, free of the taint caused by improper questions and remarks.
Based on the preceding discussion, the third assignment of error is sustained. Accordingly, the judgment of the trial court is reversed and this case is remanded for a new trial consistent with our opinion.
. . . . . . . . . . .
YOUNG, J., concurs.
FAIN, J., concurs in the judgment.