Defendant-appellant Lywanna Cooper appeals from her conviction for felonious assault in violation of R.C. 2903.12. The appellant was sentenced to sixty days incarceration and a following two-year period of community control sanctions.
Early in the morning on December 2, 1997, the appellant stabbed the victim, her husband, Keith Crymes. Mr. Crymes was at the home of his brother, Eugene Mitchell,[1] watching Monday night football with family and friends. Because he had been away from home for several days, Mr. Crymes had previously telephoned his wife to let her know where he was and to say that he would be home after the game. Mr. Crymes, described as a mild-mannered man, left home on occasion in order to avoid fighting.
Prior to the time the football game ended, the appellant arrived at Mr. Mitchell's home. The appellant was angry and insisted that Mr. Crymes leave immediately. Mr. Crymes, naturally, wanted to see the last three minutes of the football game. The appellant became verbally abusive.
Mr. Crymes walked his wife downstairs and told her he would be with her when the game was over. Later, after the game was over, Mr. Crymes and the appellant were outside arguing in the driveway in front of the home. Mr. Crymes then entered his vehicle and began to drive his nephew home. After a few blocks, Mr. Crymes noticed that one front tire and one rear tire on his van were deflated so he returned to his brother's home. Mr. Crymes believed that the appellant was responsible for the condition of his tires.
With the intent to summon assistance from AAA, Mr. Crymes exited the van and approached the house. The appellant began running her car up and down the driveway in an attempt to hit him (T. 156). The appellant resumed her verbal abuse. Mr. Crymes testified that normally, name calling does not bother him. However, after he was able to enter the house, place the telephone call to AAA, and return outside, the appellant was still verbally abusive.
The appellant finally said something that `struck a nerve' and for the first time ever he was truly angry with the appellant (T. 158). Mr. Crymes picked up a large rock with the intent of throwing it at the appellant's vehicle. Mr. Mitchell spoke to Mr. Crymes and urged him to refrain from throwing the rock. Mr. Crymes threw the rock down and walked away. The appellant then exited her car and began to taunt her husband stating that he was "a bitch, punk, not a man" (T. 158) and berating him for not throwing the rock at the car. In response, Mr. Crymes picked up the rock and threw it at the windshield of the appellant's vehicle. At the time he threw the rock, the appellant was outside the vehicle and not in any danger. At this point the appellant walked to the corner and telephoned the police.
Upon returning to the Mitchell home, the appellant went to her vehicle and retrieved something from her purse which was in the rear seat. She walked toward Mr. Crymes and stated that she would flatten his other two tires (T. 160). He responded that he would not allow it because two tires were enough. The appellant kept walking towards Mr. Crymes. Mr. Crymes testified that he knew she carried a knife with her and assumed she would puncture the other two tires. Mr. Crymes testified:
 She had her right hand in her RTA jacket, and each time I kept putting my hand up, and I guess she was looking for an opening, and each time she would kind of flinch. And that's when I knew that she had something to try to harm me in some way (T. 161).
During this time the appellant was still verbally abusive toward her husband. Mr. Crymes' anger dissipated when he threw the rock and he was simply confused as to why the appellant was behaving in such a manner.
Finally, the appellant struck Mr. Crymes on his hand with a small three-inch sword. Mr. Crymes described it as a Japanese sword which was as sharp as a razor. After the initial stab, Mr. Crymes grabbed the appellant and held her, military style, so that she could not injure him further. At no time did Mr. Crymes attempt to choke the appellant. The two fell to the ground and then Mr. Mitchell separated them. As they were pulled apart, the appellant continued to stab Mr. Crymes in his arm, leg, stomach, and head. Mr. Crymes testified that the appellant made an unsuccessful attempt to "snatch me in my crotch" (T. 165). At this point the police arrived.
The police noticed that the victim was bleeding profusely and summoned an EMS squad. Mr. Crymes started going into shock. At the hospital he was stabilized. He later received five stitches in his hand and five in his right leg (T. 169). The injury to his leg has caused damage to a nerve which continues to be bothersome (T. 169).
Eugene Mitchell's testimony largely corroborated that of his brother. Mr. Mitchell stated that the appellant was verbally abusive to Mr. Crymes, but that Mr. Crymes did not respond in kind. The appellant and Mr. Crymes left, and then returned due to deflated tires on Mr. Crymes' van. The appellant maneuvered her vehicle up and down the driveway in an attempt to strike Mr. Crymes (T. 235). Mr. Mitchell restrained Mr. Crymes from striking the appellant's vehicle with a boulder.
After the appellant telephoned the police, Mr. Mitchell observed her approach Mr. Crymes. Mr. Crymes grabbed the appellant's hand. Mr. Crymes was holding the appellant so that he could hold her back. Mitchell described this hold as a military breakdown position (T. 241). When he pulled them apart he found that Mr. Crymes had been cut.
Cleveland Police Officer Norman Saborski testified that he was on duty the evening of the incident. He and his partner, Officer Guy Saco, were dispatched to 3650 East 131st Street, Cleveland, Ohio, in response to a call stating that a female had been assaulted. The officers arrived on the scene approximately seven minutes after they received word from the dispatcher. Upon arrival, they were flagged down by the appellant. The appellant informed the officers that she was the one who had telephoned. As the appellant was speaking to the officers, the victim walked over. Officer Sabaorski testified that Mr. Crymes was covered in blood (T. 269). Mr. Crymes informed the officers that he had been stabbed by the appellant, his wife. Officer Saborski immediately sent a request for an EMS squad. Officer Saborski testified that Mr. Crymes did not seem intoxicated.
After Officer Saco removed the weapon from the appellant's jacket pocket, the appellant was placed in the zone car. Officer Saborski testified that at this point the appellant was not under arrest because the officers wanted to obtain her side of the story before making any arrests (T. 271). After Ms. Cooper was placed in the zone car, the officers spoke with the victim and then with Eugene Mitchell. EMS arrived and transported Mr. Crymes to St. Luke's Hospital.
After speaking with the victim and the appellant, Officer Saborski inquired of the appellant as to what she used to stab her husband. The appellant indicated that she used a knife and began to reach into her pocket (T. 278). Officer Saborski's partner then reached into the appellant's jacket pocket and removed the weapon. The small knife was not attached to a chain. After speaking with everyone on the scene, the appellant was placed under arrest.
Cleveland Police Detective John Sweeney was assigned to follow this case. Detective Sweeney spoke with Mr. Crymes and arranged for an interview. He also made arrangements for the appellant to be released from jail.
The appellant testified on her own behalf. Her testimony, of course, differed vastly from that of Mr. Crymes. She stated that she was in the car when Mr. Crymes threw a boulder through the windshield and that as a result she had glass all over her. After telephoning the police, she returned to the car to retrieve her purse. She then walked toward the fence, not toward her husband. He told her to leave and she refused. He first pushed her and then slapped her causing her to fall down (T. 329). As she was standing back up, Mr. Crymes grabbed her neck and held her arms back by her head. She felt as though her arms would break (T. 330). Mr. Crymes had her in a choke-hold (T. 375). The appellant's knife was attached to her key chain. She testified that she began to flail wildly. The appellant had no idea that she made contact with her husband because he never made any attempt to set her free (T. 331) She heard someone say "man you better let her go." After she was then set free she flagged down the police. The appellant testified that she was never on the ground wrestling with her husband and trying to stab him. She was attempting only to get away, not to harm (T. 334).
During cross-examination, the appellant was asked about the conversation she had with the police at the scene of the crime (T. 361). She testified that the police asked her a few questions and that she answered them. The appellant testified, without objection, that she informed the police that her husband slapped her across the face (T. 366, 372). The appellant stated that the next day her face was swollen and hurting. When asked if, while she was in the zone car, she informed the police that her face hurt, the appellant responded by stating that the police were not speaking with her at that point (T. 367). When the prosecutor pressed the point, the appellant responded that she was covered in mud, a fact known to the police (T. 367). Later the appellant testified that she did tell the police she was injured (T. 372).
The appellant testified that she did not tell the police that she stabbed her husband with the knife (T. 368), but had stated that she did not realize she made contact with the victim. Ms. Cooper also testified that she did not tell the police her arms hurt from the victim's treatment of her because the police did not ask her (T. 373). Once she was taken to the police station she requested, but never received help for her injuries (T. 374)
The appellant sets forth three assignments of error.
The appellant's first assignment of error:
 THE GOVERNMENT'S USE OF APPELLANT COOPER'S POST-ARREST SILENCE VIOLATED COOPER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10, TO THE OHIO CONSTITUTION.
The appellant argues that her Constitutional rights were violated by the prosecutor's use of her post-arrest silence for impeachment purposes during cross-examination. The appellant also asserts that the state improperly referred to her silence during closing argument. The appellant's contentions is that the state's tactic was especially harmful because of the burden she bore in proving by a preponderance of the evidence that her conduct was self-defense.
Where a defendant has received the required warnings underMiranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694, impeachment by silence violates the Constitution.Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. Where no governmental action induces a defendant to remain silent before an arrest, Doyle is inapplicable. Jenkins v. Anderson
(1980), 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86.
Just as the appellant herein, the defendant in Jenkins, supra,
testified on his own behalf and asserted self-defense. The U.S. Supreme Court found that a criminal defendant's Fifth andFourteenth Amendment rights are not violated by the use of pre-arrest silence to impeach the defendant's credibility. Impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth finding function of the criminal trial. Id.
Similarly, in Fletcher v. Weir (1982), 455 U.S. 603,102 S.Ct. 1309, 71 L.Ed.2d 490, a criminal defendant testified on own behalf that he stabbed the decedent in self-defense. The defendant's testimony was the first occasion on which he offered an exculpatory version of the stabbing. The prosecutor cross-examined the defendant as to why, when arrested, he failed to advance this explanation to the arresting officers. The Supreme Court found that, "in the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." Id at 607.
In both Jenkins and Fletcher, the court found that each state is entitled to resolve issues surrounding the impeachment of a defendant by use of pre-arrest or post-arrest silence under its own rules of evidence. In State v. Thomas (April 4, 1996) Cuyahoga App. No. 68130, unreported, the prosecution cross-examined the defendant as to his failure to inform police officers of his alibi. This court cited to Fletcher, supra, and held that no Doyle violation occurs where there is no evidence that the Miranda warnings were given and the defendant elected to testify on his own behalf.
This court has held that inquires into pre-arrest silence is permissible where the evidence is relevant under Evid.R. 611(B).State v. Shariff (March 7, 1991), Cuyahoga App. No. 58041, unreported. In State v. Boyd (May 28, 1992), Cuyahoga App. No. 60639, unreported, this court cited to State v. Sabbah (1982),13 Ohio App.3d 124 for the proposition that such cross-examination is reasonable under circumstances where it was natural and reasonable to expect the defendant would come forward with an exculpatory communication to the police. Failure to tell the police about self-defense is a proper subject of inquiry. Boyd,supra.
In the case sub judice, there is no evidence as to when the appellant was advised of her Miranda rights[2]. Neither Officer Saborski, Detective Sweeney, nor the appellant place such information in the record. While it appears that during the cross-examination itself, the state was referring to the period of time the appellant was on the scene and talking to the investigating officers and not referring to the time after she was released from jail, the record is not crystal clear. In either event, the prosecution's cross-examination was perfectly proper. The appellant chose to take the stand in her own defense and her testimony was open to impeachment. Since the cross-examination was proper, so were the comments of the prosecution during closing argument. Boyd, supra.
The appellant's first assignment of error is overruled.
The appellant's second assignment of error:
 APPELLANT COOPER'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10, TO THE OHIO CONSTITUTION WHERE THE PROSECUTION FAILED TO PROVE APPELLANT KNOWINGLY CAUSED OR ATTEMPTED TO CAUSE PHYSICAL HARM TO CRYMES.
The appellant argues that the state failed to prove that she intentionally injured Crymes. Cooper states that she reacted to the choke-hold by which Crymes held her, and that this reaction did not constitute an awareness on her part that Crymes would suffer injuries. The appellant asserts that she did not act knowingly when she injured Mr. Crymes and that she did not possess the requisite mens rea for aggravated assault.
The test for determining whether a conviction is supported by sufficient evidence remains "[w]hether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, syllabus two. In State v. Thompkins
(1997), 78 Ohio St.3d 380, the court found that sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. at 386. In addition, a conviction based upon legally insufficient evidence is a denial of due process. Thompkins, supra, citing to Tibbs v. Florida
(1982), 457 U.S. 31, 45. As Justice Cook succinctly stated in the concurrence of Thompkins, a challenge to the sufficiency of evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. Courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id.
Aggravated assault has been defined by the legislature in R.C.2903.12 as follows:
 (A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:
 (1) Cause serious physical harm to another or to another's unborn;
 (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code.
The culpable mental state of knowingly is defined as follows in R.C. 2901.22(B):
 (B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
The jury herein heard the testimony of Mr. Crymes who stated that the appellant initiated an argument by being verbally abusive; that she tried to run him over with her car; that she retrieved her knife from her car; and that she struck the first blow; that she stabbed him with a knife in his hand; and that she continued to stab him when he released his hold on her. This evidence, if believed by the jury, was a sufficient basis upon which to find that the appellant possessed the requisite mens rea
for knowingly causing harm to Mr. Crymes with a deadly weapon.
The appellant's second assignment of error is overruled.
The appellant's third assignment of error:
 THE CONVICTION AGAINST APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THERE WAS NO SUBSTANTIAL EVIDENCE UPON WHICH A TRIER OF FACT COULD REASONABLY CONCLUDE THAT APPELLANT WAS NOT ACTING IN SELF DEFENSE OR THAT THE ELEMENTS OF AGGRAVATED ASSAULT HAD BEEN PROVEN BEYOND A REASONABLE DOUBT.
The appellant argues that her actions were taken in self-defense in order to release herself from the dangerous choke-hold by which the appellant held her. Cooper asserts that the jury's finding of knowledge was against the manifest weight of the evidence.
The Thompkins Court illuminated its test for manifest weight of the evidence by citing to Black's Law Dictionary (6 Ed. 1990) at 1594:
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
Thus, as the concurring opinion noted, when deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion. The only special deference given in a manifest weight review attaches to the conclusion reached by the trier of fact. Thomplins, (Cook, J., concurring) citing to State v. DeHass (1967), 10 Ohio St.2d 230.
The jury heard the testimony of both the victim, the appellant, and the only eye witness, Mr. Mitchell. As referenced in the second assignment of error, supra, Mr. Crymes provided clear testimony as to his wife's verbal abuse and her subsequent assault. A review of the record shows that the jury had ample evidence upon which to find that the appellant knowingly stabbed her husband with a knife. Finally, this court notes that the verdict of aggravated assault, and not felonious assault, reflects that the jury carefully considered the appellant's testimony as well as the victims. The jury obviously believed that Mr. Crymes had some role in this altercation as they determined that the appellant's actions occurred after serious provocation from the victim.
The appellant's third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TERRENCE O'DONNELL, P.J., and LEO M. SPELLACY, J., CONCUR.
 ________________ JAMES D. SWEENEY JUDGE
[1] Mr. Crymes and Mr. Mitchell grew up in the same household, and although not related by blood, refer to each other as brothers.
[2] The appellant does not complain that the police failed in their duty to inform her of her Miranda rights.