# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00025-COA

**DAMIAN BUCK A/K/A DAMIEN BUCK A/K/A**        **APPELLANT**
**DAMIAN DESMOND BUCK**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/10/2023 |
| TRIAL JUDGE: | HON. MARGARET CAREY-McCRAY |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | STACEY L. FERRARO |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/02/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT**:

¶1. Damian Buck was indicted in Sunflower County for the first-degree murder of Deaubrey Roscoe while using a firearm. Following trial, the jury found Buck guilty of the lesser-included offense of manslaughter with a firearm enhancement.[1] The circuit court sentenced Buck to twenty years in the custody of the Mississippi Department of Corrections for manslaughter, with fifteen years to serve and five years of post-release supervision, and five years in custody for the firearm enhancement to run concurrently.

---

[1] *See* Miss. Code Ann. § 97-37-37(1) (Rev. 2020).

¶2.     Buck filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial, in which he argued that the jury's verdict was against the weight of the evidence and that the evidence supported his self-defense claim. Following a hearing, the circuit court denied the motion, and Buck appealed.[2] On appeal, Buck argues that his conviction was against the overwhelming weight of the evidence and that the State committed reversible prosecutorial misconduct by commenting on his silence. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.     On April 24, 2019, Christianna Howard called her neighbor Sherry Brown to see if she could use Brown's oven. Brown lived at 602A Oak Street in Indianola with her boyfriend, Otis Cole, and their friend Samuel Barnes. Howard lived at 608 Oak Street with her boyfriend, Deaubrey Roscoe, but she had dated Barnes in the not-too-distant past.

¶4.     Howard went to Brown's house to use the oven, and Roscoe came too. An argument broke out between Roscoe and Barnes about an internet bill, and the fight turned physical. At trial, Brown testified that Roscoe was "picking on" Barnes and that he "jump[ed] on" Barnes. Brown called Cole to come break up the fight, and after he did, Roscoe left and

---

[2] Buck filed his motion for JNOV on July 18, 2023. Pursuant to Rule 25.3 of the Mississippi Rules of Criminal Procedure, the motion was "deemed denied" by operation of law because thirty days passed without a court order or written agreement by the parties extending the deadline. Even so, the State responded to the motion on September 20, 2023, and the trial court held a hearing on September 21, 2023. The trial court denied Buck's motion by written order on October 11, 2023. Buck filed a notice of appeal on December 4, 2023, which was well beyond the thirty-day deadline in Rule 4 of the Mississippi Rules of Appellate Procedure.

Jurisdictional issues notwithstanding, pursuant to Rule 2(c) of the Mississippi Rules of Appellate Procedure, "[i]n the interest of expediting decision, or for other good cause shown," we "suspend the requirements" of Rule 4. M.R.A.P. 2(c).

returned to 608 Oak Street. Barnes asked Brown to call his brother—Damien Buck.

¶5.    Brown told Buck that Barnes and Roscoe had been fighting, and Buck came right over. Buck and Barnes spoke privately for a few minutes before leaving. Brown did not see where they went, but she testified at trial that Buck and Barnes left together and that she never saw either man with a gun that night.

¶6.    Roughly ten minutes after the two men left, Brown heard gunshots. Then Barnes came home, and she noticed that he was bleeding from his leg. She realized he had been shot.

¶7.    Kimberly Hodges testified that she parked outside 602B Oak Street on April 24 as she waited for a friend to come outside. Hodges saw Buck drive up in a blue Malibu, almost hitting her car. She watched him go inside Brown's house, and when he came back out, she noticed that he was carrying a gun. She did not see anyone come outside with him.

¶8.    Hodges testified that Buck walked over to 608 Oak Street and knocked on the door. Roscoe answered the door, and she watched as Buck and Roscoe talked. Roscoe stepped out of the house, and Buck stepped down off the front steps of the house. Roscoe followed Buck down the steps, and Buck continued backing away. She could not hear what either man was saying. Hodges testified that when Buck had backed almost to the street, she saw gunfire from his gun. Hodges said that Roscoe was turned sideways and fell after he had been shot. Hodges saw Buck start to walk toward Brown's house, but Roscoe jumped up and returned fire at Buck, so Buck shot again. At some point, Hodges realized that Barnes was outside too, because she heard him yell that he had been shot. Once Roscoe fell again, Buck got in his car and drove away.

¶9.     Law enforcement responded to a 911 call at Oak Street. Officer Mark Johnson arrived and found Roscoe on the ground in front of 608 Oak Street. Roscoe was wearing only underwear and appeared to have been shot. Though Roscoe was alive when officers arrived, he was taken from the scene by ambulance and later died from his injuries.

¶10.    Officer Johnson noticed a black .38-caliber revolver about three feet from Roscoe. Officer Johnson collected the gun and other items after photographing the scene. Officer Shabridget Caldwell collected three 9-millimeter shell casings in the road. She did not see any projectiles or casings near Roscoe or the revolver near him. She later testified at trial that the revolver had two rounds missing from its chamber.

¶11.    The Mississippi Crime Lab received six 9-millimeter shell casings from the Indianola Police Department, all stamped "Win 9mm Luger." There were "partial ridge details" on the casings, but ultimately the crime lab could not find any fingerprint "of value" on the casings. The crime lab also received three projectiles in this case. One was a .38-caliber projectile designed to be fired from a revolver. The other two were retrieved during Roscoe's autopsy. The two bullets taken from Roscoe's autopsy were both 9-millimeters and, based on their markings and grooves, appeared to have come from the same gun.

¶12.    Dr. Mark LeVaughn testified that Roscoe's cause of death was multiple gunshot wounds and that the manner of death was homicide. Though he did not perform the autopsy, he reviewed all records and photographs taken during the autopsy and formed an opinion "totally independent of the opinion that was generated by Dr. [David] Arboe" regarding the manner and cause of death. He testified that his opinion would not have changed if he had

4

conducted the autopsy himself.[3]

¶13.    Dr. LeVaughn testified that Roscoe suffered three gunshot wounds. He was shot in his right shoulder, and the bullet exited the body at Roscoe's armpit, then reentered at the armpit and "tracked through the body," hitting his right lung, liver, and coming to rest in his abdomen. Another bullet entered Roscoe's back and came to rest near his spine. The third wound was to the front side of Roscoe's right thigh and exited at the back of his right thigh.

¶14.    Dr. LeVaughn could not say which of the injuries happened first. Based on the entry wounds on Roscoe's back and shoulder, he believed that the shooter must have been pointing his gun at Roscoe's back. Dr. LeVaughn also acknowledged that the spacing of the wounds and the apparent trajectory of the bullets suggested that either the shooter or the victim or both were moving during the shooting.

¶15.    Buck testified in his own defense. Buck said that he and Roscoe had known each other

---

[3] Neither party addressed the effect of the United States Supreme Court's opinion in *Smith v. Arizona*, 602 U.S. 779 (2024), on Dr. LeVaughn's testimony. However, viewing Dr. LeVaughn's testimony as *Smith* requires, we find no Confrontation Clause violation with regard to Dr. LeVaughn's testimony because the testimony did not "convey[]" Dr. Arboe's statements "in support of his opinion"—Dr. LeVaughn's testimony was based solely on his own observation of the autopsy photographs and report. *See id.* at 783. Nothing in Dr. LeVaughn's testimony required the jury to accept the truth of Dr. Arboe's findings because only Dr. LeVaughn's findings were put before the jury. Put simply, Dr. LeVaughn's testimony was not merely "a conduit for what a different [pathologist] had reported." *Id.* at 787.
    Even if Dr. LeVaughn's testimony violated the Confrontation Clause, any error would be harmless, as there was overwhelming evidence to convict Buck based on Hodges's testimony and Buck's admission that he shot Roscoe. *See Willis v. State*, 352 So. 3d 602, 614 (¶31) (Miss. 2022) ("Confrontation-Clause violations are subject to harmless-error analysis. . . . An otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.").

5

since they were children and that they had a good relationship. Buck said that when Brown called him about Barnes and Roscoe's fight, he (Buck) drove over and parked in Brown's driveway. He did not see Hodges and testified that she was not there that night.

¶16. Buck went inside, and Brown told him about the "scuffle." Buck found Barnes in the bathroom and said that his face looked "like he had just been hit," but Buck did not see any serious injury. Buck said that Barnes was calm and brushed off the scuffle. Buck went outside to smoke. As he stood outside, he heard Roscoe call to him from a few houses down.

¶17. Buck walked toward Roscoe's house. He testified that he was armed but that his gun was at his waistband and that he did not draw his gun. Buck testified that he was standing near 605 Oak Street—the house between Brown's and Roscoe's homes—when Roscoe came outside carrying a gun. Buck said he told Roscoe to put the gun away and to calm down. Buck said Roscoe was angry and "screaming" at him, and he was trying to get Roscoe to calm down.

¶18. Buck testified that he did not go onto Roscoe's porch and that he remained in front of 605 Oak Street. He denied being near the street, as Hodges had claimed. He testified that he was in the yard near 605 Oak Street; Roscoe was in his yard, at an angle from Buck's position; and Barnes was near the curb. Buck said the men were all no more than three feet apart and that they were in a diamond formation.

¶19. Buck said that Roscoe was angry that Barnes was not paying for WiFi at Brown's house even though he was using it. Buck tried to tell Roscoe that it was not his business since he did not live at Brown's. Roscoe responded by asking if Buck wanted to fight too. Buck

said he did not and tried to get Roscoe to go home, but Roscoe said, "Man, f— that. F— you. I'm fixing to shoot your brother."

¶20. Buck testified that Roscoe drew his weapon, pointed it at Barnes, and then shot him in the leg. Buck testified that when he saw that, he drew his weapon and fired twice as he ran and ducked. He was certain that he only fired twice. Roscoe then shot at him and ran back toward Howard's house. He did not know if he had shot Roscoe. They were running in different directions. Buck made it to his car and fled. Buck said that Barnes ran into Brown's house. Later that night, he learned Roscoe was dead, and he turned himself in to law enforcement.

¶21. On cross-examination, Buck maintained that Hodges had not seen anything because she was not there. The State asked Buck how Hodges would have known that Barnes yelled, "I got shot," if she was not here, and Buck did not know. He testified that he had not told his version of events to Hodges or anyone other than his lawyer, and the State again questioned how Hodges would know what happened if she had not been there.

¶22. Buck also had no explanation why officers found six 9-millimeter shell casings if he had only shot twice. He also did not know why the casings were found in the street—where Hodges claimed he had been—and not in the yard—where he testified he had been. Buck testified that Dr. LeVaughn's testimony about the angle of Roscoe's wounds supported his story that the men were standing at an angle to each other because the wounds were on the side of Roscoe's body that was facing Buck.

¶23. Buck denied making a plan at Brown's house to harm Roscoe. He testified that he had

7

no reason to hurt Roscoe and did not even intend to speak to Roscoe until Roscoe called him over. Buck testified that he only pulled his gun out after Roscoe shot Barnes. He testified that he returned fire "because [his] life was threatened. [His] and [his] brother's life was in danger."

¶24. After deliberating, the jury found Buck guilty of manslaughter with a firearm enhancement. Following a sentencing hearing, Buck was sentenced to twenty years in custody, with fifteen years to serve and five years of post-release supervision for manslaughter, and five years in custody for the firearm enhancement to run concurrently with the manslaughter sentence.

## ANALYSIS

¶25. On appeal, Buck raises two issues. First, he argues that the jury's verdict finding him guilty of manslaughter is against the overwhelming weight of the evidence, which he claims supports his self-defense claim. Second, Buck argues that the State "made improper and repeated references" to his right to remain silent. We find no error and affirm.

### I. Weight of the Evidence

¶26. Buck argues that the trial court erred by denying his motion for a new trial because he claims that the evidence at trial was "overwhelmingly" in favor of self-defense. A motion for a new trial is a challenge to the weight of the evidence. *Little v. State*, 233 So. 3d 288, 291 (¶16) (Miss. 2017). We review the trial judge's ruling on a motion for a new trial for an abuse of discretion. *Id.* at 292 (¶21). In doing so, we view the evidence "in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the

8

overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). We cannot reweigh evidence, assess witness credibility, or resolve conflicts between the evidence, as "[t]hose decisions belong solely to the jury." *Id.* "When considering a defendant's claim that he acted in justifiable self-defense, . . . the issue presents a question of the weight and credibility of the evidence . . . and is to be determined by the jury." *Howell v. State*, 144 So. 3d 211, 219 (¶25) (Miss. Ct. App. 2014).

¶27. Although Buck was indicted for the first-degree murder of Roscoe, the jury found him guilty of manslaughter. To reach that verdict, the State was required to prove that Buck killed Roscoe "without malice, in the heat of passion," and "without authority of law, and not in necessary self-defense." Miss. Code Ann. § 97-3-35 (Rev. 2014). The jury was instructed that heat of passion was "a state of violent and uncontrollable rage engendered by a blow or certain other provocation given" and that it included "an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror." *See also Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010).

¶28. At trial, the jury heard Hodges's eyewitness testimony of the shooting, Brown's testimony of the events immediately preceding the shooting, and Buck's version of events. As Buck notes, there are minor discrepancies throughout the testimony, but he claims that there is no question that Roscoe was the aggressor that evening. However, the interpretation of Roscoe's actions and Buck's reaction is best left to the jury.

¶29. Hodges testified that Buck left Brown's house holding a gun and walked to Roscoe's front porch to confront him. She did not hear Roscoe threaten or shout at Buck before Buck

9

opened fire. She saw Buck shoot first and did not see Roscoe raise his gun before Buck shot him. Hodges heard several gunshots, and six 9-millimeter shell casings—the caliber of Buck's gun—were found at the scene in the areas Hodges testified that Buck was standing.

¶30.    Buck, however, claimed that he only fired twice and not in the area where the casings were collected. Buck also claimed that Roscoe was "screaming" at him, though Hodges did not hear either man yell. Buck claimed that Roscoe said, "Man, f— that. F— you. I'm fixing to shoot your brother" before shooting Barnes in the leg. Hodges did not realize Barnes was there until she heard him yell that he had been shot, which she testified happened after Buck initially opened fire.

¶31.    Much of this boils down to a call about Hodges's and Buck's credibility, which is left entirely to the jury. Even accepting Buck's testimony that Roscoe was angry and threatening Barnes, the jury could have found that Roscoe's behavior was merely a "provocation" that created "an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror." We do not find reversible error with the jury's conclusions on Buck's credibility and ultimate rejection of his self-defense claim.

¶32.    Taking all the evidence in the light most favorable to the verdict finding Buck guilty of manslaughter, we conclude that there is no manifest injustice, and the verdict is not against the overwhelming weight of the evidence. The trial court did not abuse its discretion by denying Buck's motion for a new trial.

## II.    Remarks on Right to Remain Silent

¶33.    Buck argues for the first time that the State improperly commented on his post-arrest

10

silence, beginning with questions posed to the jury pool during voir dire and continuing to Buck's cross-examination. However, Buck did not object at either time, so we review the issue for plain error only.

¶34. "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *McLaughlin v. State*, 338 So. 3d 705, 722-23 (¶51) (Miss. Ct. App. 2022) (quoting *Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016)). "To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether that error has prejudiced the outcome of the trial." *Id.* (quoting *Swinney v. State*, 241 So. 3d 599, 606 (¶15) (Miss. 2018)). We have noted that "prejudice is often lacking when the weight of the evidence against a defendant is overwhelming." *Id.* (quoting *Swinney*, 241 So. 3d at 606 (¶15)).

### A. Voir Dire Comments

¶35. Buck argues that the State's questions during voir dire that spoke directly to Buck's right not to testify were a "back door effort[] to burden shift," essentially arguing that the State planted the idea into the jury's head that the defendant must testify. However, this Court has held that similar statements are not improper and that there is an "obligation" during a criminal trial "to make sure jurors would not hold [the defendant's] failure to testify against him in the event he chose not to testify." *Miller v. State*, 801 So. 2d 799, 802 (¶¶10-13) (Miss. Ct. App. 2001).

11

¶36. Even if we were to find the comments improper, Buck did not contemporaneously object. We cannot say based on this record that the State's comments violated a "plain, clear, or obvious" legal rule, and Buck had made no argument that the alleged error prejudiced the outcome of trial.

### B. Cross-examination Comments

¶37. Buck argues that the State improperly questioned whether he had told anyone his claim of self-defense prior to trial and that this line of questioning, coupled with voir dire commentary, "inflamed" the jury to disbelieve Buck's version of events.

¶38. The Fifth Amendment to the United States Constitution guarantees a defendant's right to remain silent both during a custodial interrogation and during his criminal trial. U.S. Const. amend. V ("No person shall be . . . compelled in any criminal case to be a witness against himself . . . ."); *see Miranda v. Arizona*, 384 U.S. 436, 467-69 (1966) ("[I]f a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.").

¶39. In *Jenkins v. Anderson*, 447 U.S. 231 (1980), the United States Supreme Court held that a defendant's decision to testify and claim self-defense may open him up to impeachment based on his pre-arrest silence. *Id.* at 235-38. The Supreme Court distinguished pre-arrest silence from post-*Miranda* silence, explaining that *Miranda* warnings assure defendants that their post-*Miranda* silence will not be used against them. *Id.* at 239-40. The Court noted that "the defendant's own decision to cast aside his cloak of silence" necessarily subjects him to impeachment and that this impeachment "advances the truth-finding function

12

of the criminal trial." *Id.* at 238. The Court concluded that "the Fifth Amendment is not violated by the use of *prearrest* silence to impeach a criminal defendant's credibility" because "no governmental action induced [the defendant] to remain silent before arrest. The failure to speak occurred before the [defendant] was taken into custody and given *Miranda* warnings." *Id.* at 238-40 (emphasis added).

¶40.    In *Jenkins*, the defendant claimed self-defense after stabbing and killing his victim. *Id.* at 232. During cross-examination, the prosecutor asked about the defendant's actions after the stabbing: "I suppose you waited for the Police to tell them what happened?" and "When was the first time that you reported the things that you have told us in Court today to anybody?" and "Did you ever go to a Police Officer or to anyone else?" *Id.* at 233-34. The Supreme Court held that these were permissible questions about the defendant's pre-arrest silence. *Id.* at 238-40.

¶41.    Here, the State asked if Buck had told anyone other than his attorney his claim of self-defense—not to comment on his post-arrest silence, but to ask how Hodges would have known the details of his story if she was not there, as Buck had claimed. Plus, Buck testified that he had never told the police anything other than the fact that he wanted an attorney—so the State's comments about Buck's failure to claim self-defense prior to trial clearly fall within the *Jenkins*-approved impeachment over his self-defense claim. *See id.* at 238 ("[I]mpeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial.").

¶42.    As we proceed under a plain-error analysis, we must determine whether the comments

were a "deviation from a legal rule [that] was clear, plain, and obvious." *McLaughlin*, 338 So. 3d at 724 (¶55). Given that the State's comments were made to impeach Buck's pre-arrest silence and his claim that the State's eyewitness was not present, we cannot conclude that the comments were "a violation of a well-known legal rule and that the error was plain, clear, and obvious." *Id.* Even if we were to find that the comments were a violation of this well-known rule, there was no prejudice to Buck because of the overwhelming evidence of his guilt. *See McLaughlin*, 338 So. 3d at 722-23 (¶51).[4]

## CONCLUSION

¶43. Buck's conviction was not against the overwhelming weight of the evidence; the jurors heard Buck's claim of self-defense and found it to be not credible. That finding is the jury's role alone. The State's comments on Buck's silence were not clearly improper, and because our analysis reveals no clear, obvious error and no prejudice to Buck, we find no plain error on this issue. Buck's conviction and sentence are hereby affirmed.

¶44. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR.**

---

[4] While we find no plain error in this issue, we once again remind prosecutors, defense counsel, and trial judges that "the accused's right to be silent . . . is equally as strong as the right not to testify[,] and it is error to comment on either." *Minor v. State*, 402 So. 3d 1272, 1278-79 (¶19) (Miss. 2025) (quoting *Emery v. State*, 869 So. 2d 405, 408-09 (¶17) (Miss. 2004)). In *Minor*, the Supreme Court noted that although an impermissible comment on the defendant's right to remain silent "may not be reversible when standing alone," but when made in conjunction with other errors, "the fundamental fairness of a trial" may be "destroyed." *Id.* at 1280 (¶25). This may be so even when defense counsel fails to object to the remark.